## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00303 (ABJ)** |
| **v.** | : | |
| | : | |
| **MICHAEL JOSEPH RUSYN,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence the defendant to 45 days of incarceration and $500 in restitution.

### I.      Introduction

The defendant, Michael Joseph Rusyn, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars of property damage.

The defendant pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in the Capitol Building. As explained herein, a sentence of incarceration is warranted based upon the defendant's criminal history and because the defendant was—twice—part of a group that overwhelmed and breached points of access to the Capitol Building or police lines: once at the eastern Rotunda door, where he and others entered the Capitol Building, and again several minutes later in the Statuary Hall connector near the main entrance to the House chamber. During the minutes leading up to each assault and breach, he would have

1

heard other rioters threatening Members of Congress and calling the police traitors for defending the Capitol. Even after these two breaches, the defendant appeared to be attempting to access other rooms within the Capitol Building. He also lied to law enforcement, apparently to protect his codefendant, when he claimed that he did not know any of the people with whom he traveled to Washington, D.C. And, based on the defendant's statements to law enforcement, he does not appear to feel remorse for participating in the attack on the Capitol, nor is it clear he appreciates the seriousness of his offense.

As the government has stressed in other sentencings arising out of the events of January 6, this defendant's conduct took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. This is especially true for the rioters who occupied the building after it was breached, forcing the police to dedicate time and effort to expelling them.

But for his actions alongside so many others, the riot likely would have failed. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Here, the defendant's participation in a riot that actually succeeded in halting the Congressional certification combined with the defendant's observation of violence, his lack of remorse, and the potential for future violence suggests that a term of incarceration is necessary to promote the goals of sentencing.

## II.      Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol set forth in the Statement of Offense. As this Court knows, a riot cannot occur without

rioters, and each rioter's actions—from the most mundane to the most violent—contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

*Michael Joseph Rusyn's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, at about 5:00 a.m., the defendant boarded a bus in Jessup, Pennsylvania (near Scranton) to travel to Washington, D.C. for the former President's rally. At 7:29 a.m., the defendant posted a picture of himself, captioned "On the road again…", on Facebook. (Exhibit 1.)

By about 2:10 p.m., the defendant had left the site of the former President's rally and had traveled with a crowd of people to the eastern side of the U.S. Capitol Building. He climbed the central stairs on the Building's east side and stood before the doors leading into the Rotunda. Using his cell phone, it appears he recorded a brief video of the crowd. (Exhibit 2.) At 2:16 p.m., the defendant posted a photo of those same doors. (Exhibit 3.) At around 2:20 p.m., members of the crowd began attempting to break the windows set into that door. The defendant would have been in a position to witness this attack.

Open-source videos, available on ProPublica.org, show what was happening outside the building. A group of police officers, some carrying riot shields, attempted in vain to disperse the crowd around the east Rotunda doors. The crowd was too large to be moved. The crowd, meanwhile, chanted "Stop the steal," "Whose house? Our house!" and "USA!" A loud bang was heard, and a plume of smoke issued from near the door, at around 2:24, presumably from the discharge of a smoke or tear gas grenade.[1]

---

[1] These videos are available at projects.propublica.org/parler-capitol-videos and are sorted by time stamps. Each of these videos is tagged with a gold "near the Capitol" label. The videos are timestamped at 2:21 p.m. (the first video at this time stamp), 2:23 p.m. (there are two videos with

At around the same time, inside the Capitol Building, another rioter approached the eastern Rotunda doors and used his shoulder to force them open. (Exhibits 4, 6.) A single person tried to stop the rioters outside from entering, but he was overwhelmed by other rioters inside the building and forced away from the door. Apparently due to the crowd outside, the rioters could only get the door partially open. Meanwhile, members of the exterior crowd were assaulting police officers who stood with their backs to the eastern Rotunda door, defending it. Some carried out this assault using chemical spray.[2]

After the rioters inside forced the door open, they pulled a police officer through the door, then worked to clear a logjam of bodies outside. Moments later, rioters outside began to pour into the Capitol. (Exhibits 5, 6.) Co-defendant Deborah Lee entered first and reached her hand back through the door to pull the defendant across the threshold.[3] The defendant entered at around 2:27 p.m. and was among the first 30 to 40 people to enter the Capitol Building through the eastern Rotunda doors. *Id.*

After they entered the Capitol, Lee and the defendant walked into the Rotunda, through the Rotunda, into the Statuary Hall, and then into a small "connector" leading from the Statuary Hall to the main entrance to the House of Representatives chamber. (Exhibits 5-7). The defendant and Lee did not appear lost in the Capitol or confused about where to go, nor did they pause. Ahead of them, as they passed through the Rotunda, another rioter kicked down the metal stands supporting a rope line. (Exhibit 7.)

---

this time stamp, and both are of the eastern Rotunda doors), and 2:25 p.m. (the first video at this time stamp).

[2] This video is available at https://www.youtube.com/watch?app=desktop&v=MVullQb-Lec.

[3] Lee is easy to recognize due to her bright tie-dye jacket.

The defendant and Lee reached the connector at about 2:29 p.m. (Exhibit 8.) Around the time that they did, other members of the mob called police officers traitors and yelled things like "Tell [Speaker] Pelosi we're coming for that bitch." (Exhibit 9.)[4] The defendant and Lee were nearby at or near the time of these statements. *Id.* Moments later, as the crowed swelled, rioters began chanting "We want Trump." (Exhibit 10.) Capitol security footage, which does not record sound, visibly shows the defendant joining in the "We want Trump" chant. (Exhibit 11.) As noted in the Statement of Offense, the group of rioters in this connecter swelled over the course of about seven minutes until it packed the room. (Dkt. 34 at ¶¶ 12-13.) During this time the defendant and Lee stood within about 10 feet of the front of the group. *Id.*

Finally, after about seven minutes, this group of rioters overwhelmed the police line and surged forward. (Exhibits 12, 13.) The defendant and Lee moved forward with the crowd through the connector, across a hallway, and into the anteroom in front of the main House chamber door. *Id.* On the other side, police and members of Congress had barricaded the door and drawn weapons to defend themselves against the mob. (Exhibit 14.) Members of the crowd discussed that there were officers at the door. Members of the crowd also shouted things like "use the helmet!" or "use the crowbar!" as they sought to enter the House chamber. And again, outside the House chamber, they chanted "Stop the steal!"

The crowd outside the House chamber began to disperse between around 2:47 and 2:50 p.m., after police apparently deployed smoke canisters.[5] Thereafter, between around 2:52 and 2:53

---

[4] Exhibits 9, 10, and 13 are excerpted from footage recorded by John Earle Sullivan under the moniker "JaydenX." Mr. Sullivan is charged with several offenses arising out of the Capitol attack in case no. 1:21-cr-00078-EGS. At the time of this submission, his case remains pending.

[5] Earlier, between about 2:40 and 2:42 p.m., portions of the crowd left the House chamber anteroom, apparently realizing that they would not be able to enter that way and seeking an alternate path in. Many of these people traveled to the hallway on the opposite side of the House

p.m., the defendant and Lee walked through the hallway near the House chamber anteroom. The defendant appeared to be filming with his cell phone, and the two appeared to be looking into, or attempting to enter, rooms or alcoves along that hallway. At around 2:53 p.m., an officer led them away. From about 2:56 to at least 2:57 p.m., the defendant and Lee returned to the Rotunda, where they appeared to continue recording video with their cell phones.[6] They left the Capitol at some point thereafter.

At some point after they left the Capitol building, the defendant and Lee stood on the landing outside the eastern Rotunda doors. The defendant filmed the crowd with his phone, while Lee—next to him, and very briefly visible in his recording while she spoke—described their conduct to one or more other rioters (Exhibit 15):

| | |
|---|---|
| Lee: | We fucking did it. Right inside. We fucking did it. It's our house. |
| Unknown male: | Our House. |
| Lee: | We fucking did it. Snorted some awesome fucking pepper spray. Right? (Laughs) |
| Unknown male: | Pretty exhilarating. |
| Lee: | It wasn't, it sucked. |
| Unknown male: | (inaudible) fire extinguisher. |
| Lee: | Yeah, pretty much. Use[d] the fire extinguisher to break the glass to get in. But then they drew blood … (inaudible). We went right in through this door, straight in, all the way in. We've probably been in there about an hour. |
| Unknown male: | (inadible question) |
| Lee: | We were right in the very beginning. We broke right through the front and went right in. |
| Unknown male: | We came in through the back side. |
| Lee: | Did you? That's awesome. |
| Unknown male: | Where all the scaffolding and everything was. |
| Lee: | That's awesome. Go team! Go team! |

chamber where, minutes later, Ashli Babbitt would be shot while attempting to climb through a broken window in pursuit of Members of Congress who were retreating to a secure location.
[6] After 2:57, it becomes difficult to see the defendant and Lee among the crowd of people in the Rotunda. Beginning at around 3:02 p.m., police occupied the Rotunda and gradually began restricting the space occupied by the rioters.

On February 24, 2021, the defendant was interviewed by a Special Agent and a Task Force Officer with the Federal Bureau of Investigation (FBI). He told the FBI that he boarded a bus in Jessup, Pennsylvania to travel to Washington, D.C. and see the former President speak. The defendant said that he traveled alone and that he did not know anyone personally on the bus. As he has since admitted, this was untrue: he traveled with his co-defendant, Deborah Lee. (Dkt. 34 ¶ 16.)

During the interview, the defendant presented himself as a non-violent person and a peacemaker on January 6. He told the FBI that he did not cause any damage, engage in any violence, or steal anything while at the Capitol, which accords with the government's evidence. He claimed that, while outside the building, he took weapons from members of the crowd and surrendered them to the police; he specifically mentioning broom sticks, at least one with a nail in it. He also claimed that he received wounds to his hands and his side in the process of disarming them.

The defendant further claimed that he was swept inside the Capitol involuntarily by the force of the crowd. He said that did not make the conscious decision to go inside but was trying to avoid being trampled. He admitted that he saw people smashing windows before entering the Capitol. The defendant did not tell the FBI about being part of a group that overwhelmed a police line in the Statuary Hall connector. Likewise, the defendant said anything to the FBI about regretting his trip to Washington, D.C., or his decision to enter and remain in the Capitol.

*The Charges and Plea Agreement*

On April 7, 2021, Rusyn was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). An amended sealed complaint was filed on April 8, 2021. On April 9, 2021, Rusyn was arrested in Scranton, Pennsylvania. On April 14, 2021,

Rusyn was charged by Information with the same crimes; a superseding information was filed on August 27, 2021, adding Deborah Lynn Lee as a codefendant in all counts. On September 13, 2021, Rusyn pleaded guilty to Count Four of the Superseding Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G). In his plea agreement, Rusyn agreed to pay $500 in restitution to the Department of the Treasury.

### III.   Statutory Penalties

The defendant now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000.[7] The defendant must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). Taken together, these factors favor incarceration.

---

[7] Because the defendant pleaded guilty to a petty offense, a term of supervised release is not authorized. *See* 18 U.S.C. § 3583(b)(3).

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol Building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment. Had the defendant

personally engaged in violence or destruction, he or she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases.

Here, the defendant entered the Capitol building through a breached door shortly after it was breached; he was in a position to watch other rioters breach it. Again, inside the building, he followed immediately behind other rioters as they overwhelmed police officers and surged across a police line. In his interview with the FBI, the defendant did not demonstrate remorse or contrition; indeed, he did not appear to appreciate the seriousness of the riot or his conduct.

Outside the Capitol Building, the defendant joined a crowd of rioters outside the eastern Rotunda doors. At least ten minutes before those doors were breached, the defendant photographed and attempted to film those doors. He would have seen police attempt to repulse the rioters; he admitted to seeing others breaking the windowpanes within the doors. The defendant did not turn away. Instead, he associated himself, through his presence, with a group of people committing violent and destructive acts. He chose to remain with the crowd, and to try to force his way inside.

Inside the Statuary Hall connector, the defendant would have heard as other rioters called police officers traitors and shouted threats directed at the Speaker of the House. As above, this did not cause him to pause. He remained with this crowd until it grew until the point that it was able to overwhelm the police line. Then, with other rioters, the defendant pressed forward to the House chamber.

In his interview with the FBI, the defendant did not appear to regret traveling to Washington, D.C. or entering the Capitol. In fact, it did not appear he grappled with the problematic—and criminal—nature of his conduct. And the defendant claimed, among other things, that he was carried into the Capitol Building by the crowd and entered involuntarily. For

several reasons, the Court should not credit this self-serving claim. First, it appears from the surveillance video that the Lee, and then the defendant, were struggling through the crowd to move forward. Second, at the time Lee and the defendant entered, only one half of the Rotunda double-doors were open; it was a bottleneck. But the landing, outside, is much wider than either door, or both together. As the Parler videos show, the crowd was not so large that the defendant would have been unable to move. Third, the defendant's claim ignores the approximately *seven minutes* from the beginning of the assault on the door to its breach in which he could have turned around and left.

The defendant's behavior inside the Capitol reveals a man on a mission. He entered knowing that other rioters used violence to secure the way for him and others who followed behind. Inside, he appeared to be an enthusiastic member of the mob. The nature and circumstances of the offense weigh heavily in favor of incarceration.

### B.  The History and Characteristics of the Defendant

As set forth in the PSR, the defendant has a criminal history which includes several convictions for misdemeanor matters including one conviction for simple assault and three convictions for contempt. (Dkt. 45 at ¶¶ 31-42.) If the Sentencing Guidelines did apply to his offense of conviction, he would have five criminal history points. USSG § 4A1.1(b), (c).[8] Accordingly, he would be in Criminal History Category III. USSG §§ 4A1.1, 5A. This criminal history favors a sentence of incarceration.

The defendant is currently unemployed, but in the past has worked in construction, with experience running gas and water lines. (Dkt. 45 at ¶¶ 61-63.) The government also notes that from

---

[8] The following convictions would count: the defendant's 2014 conviction for contempt of court (because he received 6 months of incarceration), his 2017 conviction for simple assault, and his 2019 conviction for driving under the influence. (Dkt. 45 ¶¶ 33, 35, 36.)

the outset, through his attorney, the defendant expressed a desire to plead guilty and promptly resolve his case.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[9] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most

---

[9] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The defendant's criminal history suggests that incarceration, as opposed to a more lenient sentence, is needed to promote the goal of specific deterrence. The defendant's statements to the FBI suggest this as well. He lied, apparently to protect his codefendant, and he appeared to minimize his conduct. His claim that he was swept into the building involuntarily appears false on its face, is not supported by the video evidence, and ignores the choices that brought him to a position, at the time of the breach, to be pushed by the crowd. While the defendant has accepted responsibility by entering into this plea agreement, he has not expressed remorse for his conduct, nor is it clear that he feels any. The Defendant's failure to acknowledge the dangers and violence of January 6, 2021 underscore the need for a sentence of incarceration to promote the goal of specific deterrence.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[10] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A

---

[10]  Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

probationary sentence should not necessarily become the default.[11] Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have already begun to make meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

The defendant has pleaded guilty to Count Four of the Superseding Information, charging him with parading, demonstrating, or picketing in a Capitol building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C

---

[11] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of any statements he made (on social media or otherwise), whether he destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators. In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id*.; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted'

16

disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

As the number of sentences in the Capitol breach misdemeanor cases increase and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should become more apparent. The same is true for obviously mitigating factors, such as a defendant's efforts to prevent assaults on police. To aid the Court in assessing comparable sentences, the government attaches a table of cases, current through the filing of this Memorandum, showing the sentences that have been issued in connection with the January 6, 2021 attack on the Capitol. (Attachment B.)

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may also consider for reference the sentences imposed in *United States v. Russell James Peterson*, 1:21-cr-00309-ABJ (30 days of incarceration) and *United States v. Frank J. Scavo*, 1:21-cr-00254-RCL (60 days of incarceration). Both cases involve rioters who witnessed assaults on law enforcement and entered the capitol early, shortly after points of access were breached.

Peterson witnessed assaults on law enforcement on his approach to the Capitol. (1:21-cr-00309-ABJ Dkt. 27 at 6-8.) He entered the Senate Wing doors at 2:23 p.m., about 10 minutes after they were breached. *Id.* at 8-9. Peterson bragged about his conduct, and promoted the rioters' cause on social media, where this defendant did not. *Id.* at 3-4, 10-14. But this defendant's conduct was worse. He was part of the group that overwhelmed the police and allowed the eastern Rotunda doors to be breached; Peterson did not fill a similar role. He was part of a group that overwhelmed police within the Capitol; Peterson did not fill a similar role. And Peterson lied when he told the FBI that he witnessed no violence, *see id.* at 14, which is similar to this defendant's efforts to minimize his conduct. *See id.* at 14.

Scavo, for his part, entered through the same eastern Rotunda doors as this defendant (though slightly later), and witnessed the same violence at those doors that this defendant would have seen. (1:21-cr-00254-RCL Dkt. 37 at 3-6.) Scavo was in the building for substantially less time than this defendant and did not participate in a secondary breach of a police line. *Id.* at 7-10. In that respect, this defendant's conduct is more blameworthy. Scavo, like this defendant, falsely claimed that he was pushed inside the Capitol and he was unable to resist without being trampled. *Id.* at 11. But in other respects, Scavo's conduct is more blameworthy. Scavo is a local political figure, *id.* at 3; this defendant is not. Scavo helped organize a group of 200 people who traveled to

Washington, D.C. from Pennsylvania.[12] Scavo used his platform to celebrate his conduct in a manner that this defendant did not, and in a manner more significant than Peterson did. *Id.* at 2-3, 9-12. In particular, after a local newspaper published a political cartoon of Scavo driving a bus called the "Sedition Express," Scavo proudly claimed that image for his Facebook profile picture. *Id.* at 11-12. Scavo was an organizer and leader in a way that this defendant was not.

Additionally, the defendant in this case has a criminal history. The existence of a criminal history has tended to support a sentence of incarceration, as opposed to probation, for defendants charged with misdemeanors arising out of their participation in the attack on the Capitol. *See United States v. Lolos*, 1:21-cr-00243-APM (14 days of incarceration); *United States v. David C. Mish, Jr.*, 1:21-cr-00112-CJN (30 days of incarceration); *United States v. Robert L. Bauer and Edward E. Hemenway II*, 1:21-cr-00049-TSC (45 days of incarceration for each defendant); *United States v. Karl Dresch*, 1:21-cr-00071-ABJ (6 months of incarceration [time served]); *United States v. Michael Thomas Curzio*, 1:21-cr-00041-CJN (six months of incarceration [time served]).[13]

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize

---

[12] In fact, the defendant traveled to Washington, D.C. on one of the buses that Scavo chartered.

[13] Notably, most of these defendants have criminal histories that are more extensive than this defendant's criminal history, qualitatively worse, or both. But this defendant's conduct on Jan. 6 was worse than theirs. Compare this defendant's conduct, outlined above, with Mish's, *see* 1:21-cr-00112-CJN Dkt. 38 at 2-4; Hemenway's, *see* 1:21-cr-00049-TSC Dkt. 32 at 2-5; Bauer's, *see* 1:21-cr-00049-TSC Dkt. 33 at 2-5.; Dresch's, *see* 1:21-cr-00071-ABJ Dkt. 36 at 3-4; and Curzio's, *see* 1:21-cr-00041-CJN Dkt. 71 at 3-4.

and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

The defendant's conduct, here, shows an intent to engage in disorderly and disruptive conduct of a greater order of magnitude than members of the mob who entered further in time after the Capitol was breached. *Compare, e.g. United States v. Anna Morgan-Lloyd*; 1:21-cr-00164-RCL; *United States v. Joshua and Jessica Bustle*; 1:21-cr-00238-TFH. In each sentencing of a defendant in connection with this riot, the government has stressed the significance of the rioters' collective action: each person contributed to the mob's ability to overwhelm police, and each location where the police had to suppress the mob contributed to its inability to stop the prolonged violence in the throughout the Capitol grounds. But rioters like Ms. Morgan-Lloyd and the Bustles contributed to that disarray through their mere presence; here, the defendant went beyond, contributing himself to swell the size of groups that overwhelmed police officers and seized control of parts of the Capitol building. His conduct, therefore, is more serious than that of other misdemeanor defendants who were not present when points of entry were breached and police lines were overwhelmed.

## V.        Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence the defendant to 45 days of incarceration and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:      */s/ Michael J. Romano*
MICHAEL J. ROMANO
IL Bar No. 6293658
Trial Attorney / Detailee
U.S. Attorney's Office
555 4th Street, N.W., Room 4838
Washington, D.C.  20530
Office: 202-307-6691
michael.romano@usdoj.gov