UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** : | |
| : | Cr. No. 21-303 (ABJ) |
| v. : | |
| : | |
| **MICHAEL J. RUSYN** : | |
| : | |
| _____: | |

**DEFENDANT'S SENTENCING MEMORANDUM**

Michael Rusyn faces sentencing for "Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G), a class B misdemeanor or "petty offense." 18 U.S.C. § 19; 18 U.S.C. § 3559(a)(7). The statute carries a maximum incarceration period of six months. 18 U.S.C. § 3581(b)(7). The United States Sentencing Guidelines (Guidelines) do not apply. U.S.S.G. § 1B1.9. If the Court imposes any period of incarceration, the law does not permit the imposition of a term of supervised release to follow. 18 U.S.C. § 3583(b)(3). Nor does the law permit a period of probation to follow a term of imprisonment.[1] Thus, the Court's sentencing options are either 1) a straight period of incarceration; or 2) a term of probation up to five

---

[1] *See* 18 U.S.C. § 3551, which states, in the disjunctive, that "[a]n individual found guilty of an offense shall be sentenced, in accordance with the provisions of section 3553, to—

    (1)    a term of probation as authorized by subchapter B;
    (2)    a fine as authorized by subchapter C; **or**
    (3)    a term of imprisonment as authorized by subchapter D.

*See also* 18 U.S.C. § 3561(a)(3) (prohibiting probation when a "defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense.").

1

years with conditions tailored to the needs of the particular case. In assessing the appropriate sentence, the Court must consider the sentencing factors set forth in 18 U.S.C. § 3553 (a) and arrive at a sentence that is "sufficient but not greater than necessary" to meet those factors. Moreover, the Court must "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *United States v. Jones*, 846 F.3d 366, 372 (D.C. Cir. 2017) (citing *Koon v. United States*, 518 U.S. 81, 113, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996)).

A balance of the § 3553(a) factors in this case weighs in favor of a sentence that includes a three-year term of probation with conditions. In addition to standard supervision conditions, the special conditions that address the particular needs of this case include 30 days of home detention, evaluation for mental health treatment, and 60 hours of community service.

### A. Michael Rusyn's personal history and characteristics illustrate a man who is devoted to his family and his community and weigh in favor of a non-custodial sentence.

Michael Rusyn is the single father of two daughters, ages 13 and 12. PSR ¶ 45. He was not married to their mother and has, since his daughters were very little, shared custody. He sees them several times a week and provides emotional and financial support to them. Mr. Rusyn's relationship with their mother has always been strained. He has no contact with her because of that rocky history.[2] His daughters do not like

---

[2] Mr. Rusyn has three indirect contempt convictions for violation of a protective order with his daughter's mother. *See* draft PSR ¶¶ 31, 32 and 34. His relationship with his daughters' mother has been toxic from inception. When the girls were younger, he had to ask her to see them. She would agree, drive to the drop off location and, if he was more than a minute late, tell him he couldn't see them anymore and drive away. She made false accusations of abuse and told the girls to lie about him. He admits there were times that his anger and frustration got the best of him. But he has engaged in

2

their mother's boyfriends and express not wanting to go back to their mother's after their visits with him. One of his daughters has struggled academically in school lately, which is a change for her as she has always been a good student. His other daughter is also behind in school and he is trying to help her get up to speed. He makes this effort despite having struggled himself in school, where he was in special education classes in middle school and struggled to barely graduate high school. *See* Exhibit A (school record).

Even considering the negative effects that the pandemic has had on many kids' learning and mental health, Mr. Rusyn blames himself in part for the girls' stress. His participation in the events of January 6th have been widely publicized and have made him recognizable in his community. His daughters are acutely aware of his actions. One of their friends' parents is now wary of letting their children ride with him in the same car or go to events where he could be recognized. While he has been able to talk to that parent and work matters out, the embarrassment he has imposed on his children eats at him. While he has the unwavering support of his father, he knows that deep down his dad, who ran a strict household, is disappointed in him, too.

Mike Rusyn is equally disappointed in himself. His life had dramatically changed since January 6th. Contrary to what the government assumes in its sentencing submission, *see* Gov't Br. at 2, he regrets going to Washington, D.C. What began as a trip to hear what he thought would be the President's last speech turned into a mob talking control of the halls of Congress. Mr. Rusyn wondered at the time whether,

---

anger management counseling as well as family counseling with his girls. Since 2016, there have been no further incidents with respect to the protection order. Now that his girls are older and have their own phones, they communicate with their father and plan their time together without their mother's involvement.

3

because his sole source of news was FOX News, the election was rife with fraud. But he did not believe, when he took the bus to Washington, D.C., that anything other than the certification of Joe Biden as the next President would happen. He went to hear the speech of "his President," and he was certainly unaware of any larger plans to overtake Congress at the time he embarked on his trip that morning. He thought it would be like the bus ride he took to the march in Washington in November 2020, the Million Maga March of approximately 10,000 people, where demonstrators engaged in peaceful demonstration and went home. On that trip, Mr. Rusyn, who had never been to the Capitol, was struck with a sense of history and the beauty of the buildings. He went home with micro history lessons and souvenirs for his family.

When Mr. Rusyn arrived in Washington on January 6th, he waited a very long time for former President Trump to speak. He became cold while waiting for the speech because he did not bring warm enough clothes. Other members of the crowd began talking about other speakers at the Capitol, so he reluctantly, after much debate with his group, walked with the group over to the Capitol to see whomever else may have been speaking.

When the crowd began amassing at the Capitol, Mr. Rusyn saw barriers being moved by Capitol police as he stood on a grate with warm air coming out. He was trying to stay warm. As the barriers were removed, the crowd proceeded up the steps of the door, and he walked with them. As the crowd got thicker, he began seeing people with makeshift weapons, including broomlike sticks with hooks taped to the end. He saw people dressed in riot gear. He tried to disarm someone of their stick and told him to behave peacefully. The Government acknowledges that efforts by a defendant to prevent assaults on police is mitigating. Govt. Br. at 17. The same should be true of

4

efforts to disarm anyone intent on committing violence.

Because Mr. Rusyn and his group from the bus was one of the first to leave the location for Trump's speech – they thought he was going to be a no-show -- he was in the first wave of people to get to the Capitol. He was not leading anyone there. It was just the opposite. He followed his group from the bus in order to stay together. As the crowd climbed the steps, Mr. Rusyn saw a woman fall down on the way up the stairs because she was being pushed by the crowd, which was swelling and pushing towards the door. Contrary to the Government's suggestion that Mr. Rusyn intentionally made his way to the front of the crowd in an effort to breach the door, he was jostled and moved closer as the crowd became deeper behind him. He did not see who or how the doors to the building were opened but assumed it was a rioter who had already gotten into the building. He did not break windows or commit any destruction of property.

After the door was opened from the inside, he went into the building. He told the FBI that he did not make a conscious choice to go in the building but was afraid of getting trampled. This is in large part true. He was afraid of getting trampled. As the Government's video exhibits show, the crowd was extremely tightly packed together at the top of the stairs outside the entrance. It was so crowded that Debbi Lee reached back to pull him through the crowd after she got through.

At that point, Mr. Rusyn clearly knew that he could have stayed at the door, waited for a break in the crowd, and left. He admits he did not do this. Instead, he walked further into the building. In what he regrets as the biggest mistake of his life, he went with the crowd, which walked to just outside the House chamber. He had Facebook live going after the memory on his phone filled up. Neither at the time, nor after, did he make any incendiary comments or endorse violence. He admits feeling a

5

misplaced sense of being part of history, but he never has, and never will, advocate for violence. He was in the building for upwards of 45 minutes. He followed a chanting crowd. He did not lead anyone while he was inside the building; he was not a "man on a mission." Govt Br. at 11.

The Government exhibits show video of Mr. Rusyn several rows back from a line of people actively pushing through a police line in the hallway outside the House chamber, but Mr. Rusyn did not see it. He could see one demonstrator appear to be negotiating with a police officer. He could not hear all the conversations going on between the police and others who were talking with the police outside the House chamber. The crowd produced so much noise that he could not hear the conversations ten feet away from him, and he did not see the line breached by the crowd ahead of him. He was surprised when he saw the video evidence showing that the line of police had been physically pushed aside.

For a short time after that police line was breached, Mr. Rusyn was smushed in with a crowd just outside the House chamber. During this time, someone with a makeshift weapon hooked Mr. Rusyn in the stomach, which caused a small cut on his abdomen. Within just a few minutes the crowd moved back from the closed door and proceeded to go around the chamber to the Speaker's lobby. Mr. Rusyn broke from the crowd then and decided to leave the building. He continued to take video outside the windows and scans of the crowd on the way out. He engaged in conversation with an officer who told Mr. Rusyn and others that they had to leave the building for their safety. Mr. Rusyn replied "yeah," and continued walking to an exit.

When he was charged with the instant offenses by complaint, he went voluntarily to the FBI office. He answered all questions posed to him. He and co-

6

defendant Lee knew each other but had not planned to travel to the rally together. They met up on the bus and sat together on the way to Washington. They were placed in the same group coming off the bus and ended up spending the day together. At the Capitol, the two of them got separated from the rest of their group. Mr. Rusyn disagrees with Ms. Lee's vocal bragging on social media about her activities that day (much of which are not true), and he has cut off communication with her. He does not wish to be associated with someone who he feels does not understand the gravity of what happened.

Contrary to the Government's assumptions, Mike Rusyn fully understands the gravity of his participation in the events of January 6th. He is ashamed of himself and was, quite frankly, in the immediate aftermath of the day.[3] He is embarrassed for himself and his daughters, who he believes have lost faith in him. He is actively trying to help them address the turmoil they are managing at home with their mother, who pits her children against their father and has a new boyfriend that the girls hate. *Id*.

One of his daughters, because of his troubling participation in the January 6th events and how public it has been in their community,[4] is wary of trusting him. When

---

[3] Mr. Rusyn intends to submit a letter to the Court but is, as of this writing, still working on it.

[4] *See, e.g.,* Krawczeniuk, B., "*Rusyn may plead guilty in Capitol riot case,*" The Times Tribune (July 30, 2021), available at: https://www.thetimes-tribune.com/news/crime-emergencies/rusyn-may-plead-guilty-in-capitol-riot-case/article_3f9017d4-32dc-5b09-a63a-fd3679b936db.html (last accessed December 6, 2021); Forand, J., "*Pa. volunteer firefighter expected to plead guilty to role in Capitol riot,*" FireRescue1 (July 30, 2021), available at: https://www.firerescue1.com/crime/articles/pa-volunteer-firefighter-expected-to-plead-guilty-to-role-in-capitol-riot-7j2la1DRtzVJBpZb/ (last accessed December 6, 2021)

she articulated that to him, he felt like he had been punched in the gut. That his actions have chipped away at his relationship with his children, the thing he holds most dear, has sent him into a spiral of self-loathing.

Since that conversation with his daughter, Mike Rusyn has withdrawn. He is anxious and depressed and fearful of the further disruption in his daughter's lives because of his mistakes. *Id*. He is now actively seeking out a therapist to help him manage his anxiety and depression. *Id*. He was the only pipefitter to be laid off from his recent union job, so he is currently unemployed. His daily life involves caring for his disabled grandmother and being a father to his teenage girls. He takes his grandmother to the store, to doctor's appointments, and takes care of the house. He cooks and cleans and does laundry for her. As Mr. Rusyn's great-aunt, Carol Antenori, explains to the Court, Mr. Rusyn's willingness to move from his father's house to his grandmother's has allowed his grandmother to move out of a nursing home, where she had been depressed and her condition had been worsening. Exhibit B (Letter to Court from Carol Antenori). His care for her has allowed the family to see her, at age 87, spend her aging years at home. *Id*. His family depends on his "kindheartedness." *Id*. It is unclear, if he were to be imprisoned, who would be able to provide the daily care he has been providing.

With respect to his children, he coaches them in softball, guides them to be good people, and spends as much time as he can with them. Though he was not a particularly good student himself, he tries to help his girls with their homework and cares deeply about their academic success. He did not enjoy that kind of support as a kid. His mother was absentee for periods of his childhood, though their relationship became much better in Mr. Rusyn's adulthood. There were times she dropped him off

8

to live with his grandparents to focus on her three younger children.[5] When Mr. Rusyn was in middle school, the court granted his father custody. Mr. Rusyn struggled in school and ended up in special education classes for reading and math. He was embarrassed because other students knew who the special education kids were. He wanted to start fresh in high school, so he asked to go live with his mom. She provided no supervision and paid no attention to his schooling. In his words, "she never bothered to check whether I was home or not at night." Mr. Rusyn barely graduated high school with a class rank at the very bottom of his class. *See* Exhibit A (school record). He has vowed as a parent to be emotionally, physically and financially present with his own children, a promise he has kept. Indeed, he attended school to become a pipefitter apprentice, which was a very difficult program for him to get through given his learning difficulties. He persevered in order to make a better living and a better life for his kids.

      Others have gone out of their way to explain to the Court that Mike Rusyn is a devoted father and deeply committed to his community. Keith Herrick writes that "I am a firefighter in the same station as Mike who has on many occasions put my life and others in his hands. For this I will be forever grateful to have a person such as Mike to keep an eye out for me, our crew and our community." Exhibit C (Letter to the Court from Keith James Herrick). Amber Armitage writes that Michael Rusyn's "true love and commitment as a father to his daughters speaks true to his character in a way

---

[5] Mr. Rusyn advised the probation department at the time of his presentence interview that his mother raised him. PSR ¶ 45. He lived with her for much of his childhood, but did not share that there were long periods of time when she dropped him at his grandparents. She also had an alcohol problem that impeded her ability to parent him. He feels disloyal to her memory to "air her dirty laundry," but wishes for the Court to understand a fuller picture of his upbringing.

I have never seen." Exhibit D (Letter to the Court from Amber Armitage). Marlene Stephenson, another coach who has known Mr. Rusyn in his softball coaching capacity, describes him as a dedicated "coach to all the players on the team as well as his assistant coaches and families." Exhibit E (Letter to Court from Marlene Stephenson). Jeff Herbert speaks of Mr. Rusyn's willingness to coach even though he had no experience so that he could be there for his girls. Exhibit G (Letter to Court from Jeff Herbert).

As a good friend of Mr. Rusyn, Ms. Armitage tells the Court, "He understands and regrets the situation he has placed himself in and is incredibly remoreseful [sic] for it. . . . I know that Michael understands he now has to be held responsible for his actions but is willing to do what is necessary to make things right." Ex. D. He has told his father, who remains very supportive of him, that he is remorseful for his actions. Exhibit F (Letter to the Court from Joseph Rusyn).

Going forward, he is a changed person. Mr. Rusyn has completely turned off politics and the news. He no longer trusts the veracity of any news source and, frankly, does not trust his own ability to ferret through the conflicting information on social media. He no longer participates in any conversations about politics among his peers at the firehouse, where he has volunteered and served his community as a fire fighter since he was 16 years old. He has no interest in voting again. Any discussion of politics makes him feel sick to his stomach. Instead, Mr. Rusyn is struggling to find some normalcy in his relationships with his children and to move on from what he considers the biggest mistake of his life.

## B. The nature and circumstances of the offense are very serious.

There is no question that the historical events of January 6th were gravely

10

dangerous to the country's democracy. The former President of the United States perpetuated a colossal lie about the results of a fair election, and that lie was propagated over and over again on social media and in one of the major news outlets. It is accurate to say that many participants truly believed that the election had been stolen. Mr. Rusyn, though his sole source of news was FOX News, was more circumspect. He was not sure if the election had been stolen or not. He believed at the outset that he was buying a bus ticket for a rally at which the former President would make his last speech to the nation. The events that unfolded were planned by people other than Mr. Rusyn. In time, perhaps the country will more fully understands how much planning went into the insurrection and how high into the government that planning went.

Whatever those answers turn out to be, Mr. Rusyn recognizes that it was the individuals like him – and their willingness to follow along when the building's doors were breached – that allowed what began as a peaceful demonstration to turn into a mob. While he did his part to try to disarm others intent on doing physical harm, and he committed no destruction of property himself, he understands that his willful presence where he was not supposed to be contributed to a gravely serious assault on the Capitol. For this reason, he must concede that, though he is charged with but a Class B misdemeanor, the least serious criminal offense in the code, his minor individual actions cannot be fully divorced from the conduct of the whole.

### C. Probation with an onerous condition of home detention will reflect the seriousness of the offense, promote respect for the law, and provide just punishment under § 3553(a)(2)(A).

The seriousness of the offense and respect for the law can be addressed through conditions of probation that are punitive, including 30 days of home detention. First,

perhaps because the United States Sentencing Guidelines place so much emphasis on incarceration, the infringement on one's liberty occasioned by supervised probation is sometimes forgotten. *See Gall v. United States,* 552 U.S. 38, 48, 128 S. Ct. 586, 595, 169 L. Ed. 2d 445 (2007) ("We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty."(citations omitted); *see also, Frank v. United States*, 395 U.S. 147, 151, 89 S. Ct. 1503, 1506–07, 23 L. Ed. 2d 162 (1969) (while "certainly a less onerous restraint than jail itself," probation is "a significant infringement of personal freedom."). When coupled with home detention, that infringement on freedom is clearly even more onerous and serves a punitive function. *See United States v. Testerman*, 446 F. Supp. 2d 640, 643 (W.D. Va. 2006) ("obligations of probation, home detention, and a fine, are of themselves just punishment."). *Cf. United States v. Martin,* 363 F.3d 25, 39 (1st Cir. 2004) (Where Defendant has served time in home detention that will not be credited toward his new sentence [by the Bureau of Prisons], he has served a portion of the 'just punishment for the offense. . .'"); *United States v. Perry*, 473 F.Supp.3d 1250, 1254 (D. Co. July 20, 2020)(granting compassionate release, converting 36-month prison term to "time served" and imposing 33 months of home detention as a condition of supervised release because home confinement "will continue to impose just punishment for his offense[ ] by restricting his liberty. . .").

    Supervised probation with home detention and community service has sufficient "teeth" to promote respect for the law, provide just punishment and address the seriousness of the offense. It is "no greater than necessary" to meet these sentence goals.

### D. General and personal deterrence can be effectuated without incarceration.

Incarceration is not the best means to effectuate general deterrence in this case. The case before the Court is *sui generis* in most respects. Most jurists and practitioners before January 6th would fairly confidently assume that incarceration was not necessary to meet the sentencing goals for a conviction of a class B misdemeanor, at least in the vast majority of cases. Here, the events of January 6th have been widely publicized around the world.[6] The Government continues to locate and charge low level participants like Mr. Rusyn. As of December 6th, 719 individuals have been charged.[7]

While the seriousness of the offense is unique for its historical context, it is also unique in its widespread publicity. The fact that over 700 people have been apprehended and prosecuted for low-level offenses offers significant general deterrence because of that publicity. The certainty of apprehension, and not the length of the sentence, is the prime factor in deterrence, not the length of incarceration imposed.[8] It is fair to conclude that the sheer number of January 6th cases thus far

---

[6] *See* "AP Photos: Scenes of violence at U.S. Capitol shock the world," AP News (January 6, 2021), available at: https://apnews.com/article/joe-biden-donald-trump-electoral-college-elections-de812995a8c7cbea5c1de56a3d1aa007 (last accessed December 8, 2021)

[7] *See* Hall, M., *et al.*, "*719 people have been charged in the Capitol insurrection so far. This searchable table shows them all,*" Insider (December 6, 2021), available at: https://www.insider.com/all-the-us-capitol-pro-trump-riot-arrests-charges-names-2021-1 (last accessed December 8, 2021).

[8] *See* Wright, V., PhD, "*Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment,*" Sentencing Project (November 2010), available at: https://www.sentencingproject.org/wp-content/uploads/2016/01/Deterrence-in-Criminal-Justice.pdf ("Research to date generally indicates that increases in the certainty of punishment, as opposed to the severity of punishment, are more likely to produce deterrent benefits.") (last accessed December 8, 2021).

have shown the general public that apprehension is certain for even the most minor participants. It is for this reason that incarceration is not necessary to further the goal of general deterrence. The general public is already well aware that participation in events such as the January 6th insurrection will bring swift prosecution. The most serious offenses are rightly being resolved by sentences of imprisonment. Supervised probation -- with onerous conditions such as home confinements and community service -- is sufficient to meet the goal of general deterrence given the widespread public knowledge of these cases.

Moreover, incarceration is not necessary to incapacitate Mr. Rusyn or prevent him personally from committing other crimes. First, the statute itself limits the possible incarceration period to six months, so the incapacitation argument is weak at the outset. There is nothing in Mr. Rusyn's record counseling the conclusion that he is so incorrigible that the public needs to be protected from further crimes even for a short period of time. Second, while Mr. Rusyn has a prior misdemeanor criminal record, the prior offenses have been minor, and most are stale. Mr. Rusyn has been on pretrial supervision without incident since the inception of the case on April 9th, which suggests he can be successfully supervised in the community.

  E. **The need for the sentence to "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner" counsels in favor of probation with conditions to meet his mental health needs**.

Michael Rusyn, as sentencing for this case has approached, has been anxious, depressed, tearful and experiencing panic attacks. He has begun the search for mental health treatment and is very open to addressing his mental health care. A sentence of probation that includes a condition for mental health evaluation and treatment will

meet the need for the Court's sentence to provide him the necessary treatment in the most effective manner. A straight term of incarceration will provide no mental health care opportunities and there will be no supervised release to follow, so no conditions of post-incarceration supervision could ensure the Court that he is getting the necessary care.

### F. Probation with home confinement and community service will not create unwarranted sentencing disparities among similarly situated defendants.

Section 3553(a)(6) requires the Court to consider "the need for the sentence imposed to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." The operative word, is, of course, "unwarranted," recognizing that there may be particular circumstances of a case that do warrant differences in the sentences imposed.

Here, the Court is distinguishing among numerous defendants charged with the same class B misdemeanor. Thus, what seem to be emerging as pivotal factual benchmarks of differentiation include the level of remorse, or acceptance of responsibility, that a particular January 6th defendant expresses, and whether there were incendiary social media postings by a particular defendant that suggested a lack of appreciation for the wrongfulness of the participation. Factors including whether the person engaged in violence or property destruction were considered in the Government's charging decision, so the universe of defendants who entered guilty pleas to § 5104(e)(2)(G)("Parading, Picketing or Demonstrating), by definition engaged in no violence or property destruction. Finally, conduct during their time in the building is also a differentiating factor.

On one end of the spectrum are cases like Jennifer Leigh Ryan, (21-cr-00050

15

(CMC)), in which the Government sought, and the Court agreed to, a sentence of 60 days incarceration. *See* Dkt. #48 (Government Sentencing Memorandum). In Ms. Ryan's case, she used a platform as a social media influencer to broadcast to millions of people her utter disdain for the prosecution after the events of January 6th. During the rioting, she livestreamed incendiary comments about going to "war" and commending property destruction. *Id.* After the riot, on national television, she called herself a "martyr" and continued not only to express pride in her involvement in the riot ("I did nothing wrong"), but also to spread false information about the violence, contending that the participants were all peaceful. *Id.* Even at her interview with probation, she minimized her conduct and said she did not know about the riot when going to the Capitol. *Id.* This, despite livestreaming from her hotel room that they were going to the Capitol to start war after publicizing the breach of the building and destruction of property being reported in the news. *Id.* Finally, long past the events of January 6th, Ms. Ryan said to a national audience that she would never go to prison because of her appearance and social status.[9] *Id.* This person was sentenced to 60-day incarceration despite, similar to Mr. Rusyn, having a misdemeanor criminal record. *Id.* Yet, the Government here seeks a 45-day sentence for Mr. Rusyn. There seems to be little uniformity in the Government's sentencing recommendations, as there are major differences in Mr. Rusyn's posture towards his case and Ms. Ryan's.

  Mr. Rusyn's response to his prosecution has been the polar opposite of Jenna

---

[9] Ms. Ryan is reported to have said more specifically that "I have blonde hair white skin a great job a great future ... sorry to rain on your hater parade. I did nothing wrong." *See* Klawins, J., "*Jenna Ryan, 'White' 1/6 Rioter Who Said She'd Avoid Jail, Now Plans to 'Detox' in Prison,*" Newsweek (December 6, 2021), available at: https://www.newsweek.com/1-6-rioter-who-said-shed-avoid-jail-because-shes-white-now-plans-detox-prison-1656631 (last accessed December 9, 2021).

Ryan's. He made no posts about his presence at the Capitol on social media after January 6th. He has distanced himself from his co-Defendant, Debbi Lee, who was much more defiant in her posture towards the case, asserting after the riot that she had a right to be there. *See* 21-cr-303 (ABJ), Dkt.  (criminal complaint against Deborah Lee). Mr. Rusyn has repeatedly expressed remorse about his participation in the events of January 6th. He cooperated with FBI by making a voluntary statement upon request. He ignored a text from Deborah Lee to plead "not guilty" and instead entered a timely guilty plea.

Mr. Rusyn's case is also distinguishable from the *United States v. Russell Peterson* case, in which this Court sentenced Mr. Peterson to 45 days. *See* 21-cr- 309 (ABJ), Dkt. #32. In that case, the Court was particularly troubled by Mr. Peterson's social media posting after the riot in which he minimized the severity of the riot by saying he had "stormed the castle, broke into chambers, and smoked a blunt on the couch. Overall I had fun. LOL." *See* Dkt. #32 at 19 (Sentencing Minutes). During the time he was in the building, he livestreamed and said that they had "taken the Capitol." Mr. Rusyn made no such statements.

The Government suggests that others with more serious criminal records than Mr. Rusyn are in the universe of comparable cases. *See* Govt Br. at 19, fn. 13 ("Notably, most of these defendants have criminal histories that are more extensive than this defendant's criminal history, qualitatively worse, or both."). At least two of the cases the government cites are for defendants who were detained and were sentenced to 6 months' time-served because they would overserve the statutory maximum. These cases are not appropriate comparison cases.

The Government argues that Mr. Rusyn deserves 45 days because his conduct

17

was more serious than those defendants with more serious criminal records. Govt Br. at 19, fn 13. To the contrary, the other cases appear to present defendants with equally or more serious conduct on January 6th. *See United States v. Lolos*, 1:21-cr-00243 (APM). Mr. Lolos, who was sentenced to 14 days, is said to have spent 43 minutes in the building, about the same as Mr. Rusyn. *See* 1:21-cr-00243 (APM) Dkt. #32 (Government Sentencing Memorandum). While the Government sought 30 days incarceration in that case, it is hard to see a principled distinction in the request the Government makes here for a 45-day sentence. Mr. Lolo's conduct in the building was more disturbing that Mr. Rusyn's: he stated that he intended to "storm the Capitol" and entered the building through a broken window with evidence of tear gas in the air. He was waving his flag and chanting and only left after being confronted by "heavily armed officers." *Id*. Finally, after the insurrection, he was so recalcitrant that he was removed from a commercial airplane for disrupting other passengers with his chants of "Trump 2020." He was in fact charged for his conduct on the plane. *Id*. at 12.

In the *United States v. Robert L. Bauer* case, 1:21-cr-00049 (TSC), the Government sought a 30-day sentence despite the fact that Mr. Bauer showed no insight into the wrongfulness of his actions, telling the FBI that "I don't feel like I done nothing terribly wrong." *See* 1:21-cr-00049 (TSC), Dkt. #33 at 10-12. (Government Sentencing Memorandum). While in the building less time than Mr. Rusyn, Mr. Bauer went to the location where police officers were being assaulted. He had an extensive criminal record, including felony convictions and prior prison sentence of 3 years. *Id*. Mr. Rusyn witnessed no assaults on officers and made attempts before he entered the building to disarm people with weapons.

Mr. Rusyn took video of his travels inside the building and also of the crowd

18

outside the building in front of the rotunda after he and Debbi Lee left the building. In all the video produced by the Government, undersigned has been unable to find even one instance of Mr. Rusyn making any incendiary statements that support violence or bragging about being in the building. Nor does the Government point to any. Instead, the Government points to video taken after Mr. Rusyn left the building in which another "unknown" male brags about his entry in the building and being pepper-sprayed. Gov't br. at 6.

The Government attributes to Mr. Rusyn by association co-Defendant' Lee's statements, many of which were hyperbolic and not borne out by the evidence. There is no evidence, for instance, that Mr. Rusyn (or Ms. Lee) used a fire extinguisher to break glass to get in. And Mr. Rusyn made no comments supporting Ms. Lee's in which she boasts about being in the building to a third person. He did not livestream or take video of himself bragging or make false or inflammatory statements about his actions in the Capitol. He made no other social media posts bragging about his actions after they left the building.

The Government makes much over Mr. Rusyn's position to see other defendants' actions, specifically the breach of the police line outside the House chamber in the hallway. Mr. Rusyn may have been in a position to see it, but he did not.

Lastly, Mr. Rusyn's failure to affirmatively express regret for his involvement on January 6th in his FBI interview is not indicative of a lack of remorse. He asked the questions posed to him in the interview. He did not tell the FBI he knew Debbi Lee, and unartfully suggested he was swept into the building by the crowd, but in all other respects he was forthcoming. He promptly entered his guilty plea because he wanted to

take responsibility and move the matter behind him as quickly as possible for himself and his family. That he was silent about his remorse at the time of the FBI interview should not lump him in with cases where the defendant actively expressed having done nothing wrong, which is a clear expression of lack of remorse.

### G. Conclusion

For the foregoing reason, Mr. Rusyn asks the Court to impose a sentence of three years of probation, 30 days of home, and 60 hours of community service.

Respectfully submitted,

Andrea Dechenne Bergman
Assistant Federal Public Defender
Counsel for Michael Rusyn