UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | Cr. No. 21-303 (ABJ) |
| v. | : | |
| | : | |
| **MICHAEL J. RUSYN** | : | |
| | : | |
| _____ | : | |

**DEFENDANT'S SUPPLEMENTAL
SENTENCING MEMORANDUM**

Mr. Rusyn submits this supplemental memorandum to update the Court on three issues prior to sentencing: his employment status, his mental health treatment, and his extraordinary community service displayed through heroism in saving a fellow firefighter in a recent fire. In addition, the defense points to several cases in which courts imposed probation sentences for similarly situated defendants and asks the court to consider them in order to avoid unwarranted sentencing disparities.

**A. Mr. Rusyn has begun working again since submission of the initial sentencing memorandum on December 9th.**

Mr. Rusyn, a member of the pipe-fitters union, began full time employment at Sanofi Pasteur[1] in Swiftwater, Pennsylvania, on December 13, 2021. He earns $46.23 an hour, which is an excellent wage that allows him to continue supporting his children. He drained his savings to keep up with child support during his recent layoff, especially

---

[1] Sanofi Pasteur is a pharmaceutical company whose Swiftwater site "includes more than 60 buildings on more than 500 acres in the Pocono Mountains of Pennsylvania. Functions at the site include Research and Development, Commercial Operations and Vaccines Industrial Affairs. The site is the largest producer of influenza vaccine in the US, making more than 60 million doses of the vaccine. The site also produces millions of doses of vaccines for seven other diseases." *See* https://jobs.sanofi.us/Swiftwater-Employees (last accessed December 20, 2021).

1

because his unemployment took a long time to begin. The job has promise for long-term employment as many of the union employees have worked at that location for several years. Mr. Rusyn is thrilled to be back to work and hopes not to lose the job to incarceration. Despite some days with long hours on the job, Mr. Rusyn continues to care for his grandmother by making sure all her meals are prepared before he leaves for work for the day.[2] Mr. Rusyn asks the Court to take into consideration his employment status as a mitigating factor in favor of a sentence of probation rather than short-term incarceration, which would serve only to effectuate his termination of employment.

### B. Mr. Rusyn has demonstrated extraordinary commitment to his community in his recent work as a volunteer firefighter.

As the Court is already aware, Mr. Rusyn has been a volunteer firefighter for his town since he as a teenager. *See* PSR ¶ 45. On December 12th, there was a porch fire at the home of a local Olyphant, Pennsylvania house.[3] Mr. Rusyn and several other firefighters responded to the blaze, which was exacerbated by high winds. *Id.* During the fire, a fellow firefighter fell through the floor and got stuck, at which point Mr. Rusyn pulled him out. This occurred while another firefighter had a portion of a wall fall on

---

[2] A defendant's caretaking role for a family member is a permissible basis for sentencing similar defendants to disparate sentences. *See, e.g., United States v. Prosperi*, 686 F.3d 32, 49 (1st Cir. 2012) ("post-*Booker,* '[a] district court … may take idiosyncratic family circumstances into account, at least to some extent, in fashioning a variant sentence. Although policy statements issued by the Sentencing Commission are relevant in determining the type and degree of idiosyncracy [sic] necessary to support a given variance, they are not decisive. Here, for the reasons stated, the particular circumstances of both Prosperi and Stevenson were a permissible factor for the court to consider in imposing its variant sentences.")(quotations and citation omitted).

[3] *See* Munoz, V., "*Fire crews go against high winds battling porch fire in Olyphant*," Newsbreak (December 12, 2021), available at: https://www.newsbreak.com/news/2458862826409/fire-crews-go-against-high-winds-battling-porch-fire-in-olyphant (last accessed December 20, 2021).

him. He and the firefighter Mr. Rusyn pulled from the floor were able to pull their third firefighter to safety. Though he was hospitalized, he is alive and will recover from his injuries. Mr. Rusyn sustained second and third-degree burns on his hands during the blaze. *See* Exhibit A (photos of Mr. Rusyn's hands). The following day, notwithstanding the state of his hands, he began working his new job at Sanofi Pasteur.

Mr. Rusyn's extraordinary commitment to his community distinguishes his case from many others in which terms of incarceration were imposed. Indeed, the Court may consider a defendant's long history of community service in evaluating a defendant's personal history and characteristics and how it mitigates the sentence. *See, e.g., United States v. Tomko*, 562 F.3d 558, 570-74 (3d Cir. 2009) (Upholding variance to probation for defendant with long history of community good works and rejecting government argument that the variance created unwarranted sentencing disparity among similarly situated co-defendants). Indeed, the *Tomko* court noted that when the Sentencing Guidelines became advisory after *United States v. Booker,* 543 U.S. 220 (2005), the Supreme Court "was fully aware that sentencing disparities would likely increase." *Id*. at 574 (quoting *Booker* at 263). Yet, "despite that awareness, the *Booker* Court was confident that the advisory Guidelines system would 'continue to move sentencing in Congress' preferred direction, helping to avoid excessive sentencing disparities while maintaining flexibility sufficient to individualize sentences where necessary.'" *Id*. (quoting *Booker* at 264–65).

Though the sentencing guidelines do not apply in this case because the offense is a class B misdemeanor, the reasoning is still instructive. That other similarly-situated defendants have been incarcerated for their involvement on January 6th is only half of the analysis in assessing sentencing disparity. In cases where someone like Mr. Rusyn

3

has distinguished himself as an exemplary member of his community – as someone who literally volunteers to put himself in harm's way to save the people and property of others – there is a *reason* for a sentencing disparity among similarly-situated defendants. It supports a conclusion by this Court that the personal history and characteristics of this particular defendant outweigh the nature and circumstances of the offense, *and* that sentencing Mr. Rusyn to probation and community services does not create the *unwarranted* disparity that the 3553(a) admonishes against.

### C. Probation with a short period of house arrest (with approved absences for work and to see his children), rather than any period of incarceration, is required to prevent disparity in sentencing.

The Government has made much of what it assumes is a lack of remorse by Mr. Rusyn. *See* Gov't Br. at 2. First. As his attached letter explains, he is extremely remorseful and has been since January 6th.

Second, as a point of comparison, the defense notes here that there are many cases in which defendants were sentenced to probation but demonstrated far less remorse than Mr. Rusyn. In these cases, defendants engaged in much more egregious, post-riot amplification and bragging about their presence at the Capitol on January 6th. For instance, in *United States v. Wilkerson*, 21-cr-302 (CRC), the sentencing judge imposed 36 months of probation without house arrest. Mr. Wilkerson was in the building for 14 minutes. Like Mr. Rusyn, he engaged in no violent acts. He carried a flag, climbed scaffolding, held up his phone to capture the crowd's attack on police officers, and entered the building after walking over downed barricades. He bragged in Facebook messages that it had been a good day, that the Capitol Police were to blame for the violence, and that he hoped that the military would engage in a "power play" to continue the goals of the insurrectionists. *See* Govt' Br. at 2-3 (dkt. #23).

In *United States v. Lori Ann Vinson*, 21-cr-355(RBW), the sentencing judge imposed five years of probation and no house arrest over the Government's request for 30 days incarceration. Ms. Vinson was a right-wing media tool and effectively used social media and television appearances to amplify not just her participation in the riot but also her lack of insight or remorse. According to the Government's sentencing memorandum:

> [Ms. Vinson] publicized and defended her participation on Facebook and in multiple television interviews with news outlets across multiple states. Her recorded statements to news outlets include, "I hope that is something I remember and say, 'I'm glad I was a part of that' thirty years from now"; "People have asked are you sorry that you done that, absolutely I am not, I am not sorry for that, I would do it again tomorrow" ; "I felt like I've done nothing wrong and I wouldn't change it "; and describing her conduct as "justified." Here, the defendant's participation in a riot that actually succeeded in halting the Congressional certification, combined with her consistent and troubling minimization and justification of the disastrous events of that day, warrant a sentence of incarceration.

*See* Gov't Br. at 2 (dkt. #43). Ms. Vinson and her husband were also alleged to have been in a crowd that pushed through a police line in the building. *Id.* at 7. The Vinsons watched as a police line was attacked by rioters. *Id*. They were in the building essentially the same amount of time as Mr. Rusyn: 42 minutes. *Id*. The Government goes on to detail about Ms. Vinson's media appearances and her minimization of her participation at the Capitol on January 6th. *Id.* at 9-11. Finally, the Government details numerous times Ms. Vinson misled the FBI in its interviews with her. *Id.* at 11-12. Quite frankly, the conduct of Ms. Vinson and her husband, who also was sentenced to five years of probation, is far more egregious than Mr. Rusyn's. Their conduct in the building can be distinguished by the violence against officers that the Vinsons witnessed and actively filmed. Mr. Rusyn saw no such violence and did not experience any tear gas exposure until he was nearly out of the building. Mr. Rusyn made no social media posts after

5

January 6th. And his omission to the FBI was an effort to protect a friend. He was otherwise completely truthful about his involvement.

In *United States v. Andrew Wrigley*, 21-cr-42(ABJ), this Court imposed 18 months of probation without home confinement. Yet, Mr. Wrigley, though in the building for but a minute, was described by the government as one of the first entrants into the building after the entry door was breached. *See* Gov't Br. at 1-2 (dkt. #35). The Government also stated that Mr. Wrigley entered the building a mere four minutes after the breach. In Mr. Rusyn's case, it was approximately 11 minutes. Mr. Wrigley is said to have entered the building despite hearing concussive sounds, smelling tear gas and seeing officers in riot gear. Mr. Wrigley also bragged on social media after January 6th that he had been in the building and had been tear-gassed. *Id*.

This Court has expressed in other cases that lack of remorse in the aftermath of January 6th, in particular use of social media to express a lack of appreciation for the severity of the events of the day, factor largely in determining whether a sentence of incarceration is necessary. *See, e.g.,* Sentencing Transcript in *United States v. Russell Peterson*, 21-cr-309 (ABJ) (dkt. #32 at 19) ("after you left you were still not chastened and you essentially bragged about it. You said you'd 'stormed the castle, broke into chambers, and smoked a blunt on the couch. Overall I had fun. LOL.' I have to tell you, it is your remarks that have caused me to think long and hard about this sentencing and have made it extraordinarily difficult to arrive at the conclusion that probation would be an adequate response.").

Finally, In *United States v. Jordan Stotts*, 21-cr-272 (TJK), the Government, similar to this case, sought a 45-day sentence. The defendant, according to the Government's sentencing memorandum, "stood face-to-face with and shouted at

Metropolitan Police Department officers while they were pushing back rioters, including the defendant at least three times, out of the Capitol Rotunda; he scaled the wall on the Upper West Terrace to gain access to the Capitol, and once inside he raised his fist in support of those who breached the Capitol Building." *See* Gov't Br. at 1-2 (dkt. #24). Moreover, in Mr. Stotts's "post-riot statements on Facebook, . . . he boasted about the 'siege,' claimed the fight was 'far from over,' and exclaimed, 'I'll be back.'" He spent approximately an hour in the building. *Id.* at 6.

The Government brief details an aggressive confrontation where Mr. Stotts pushed against officers and yelled in their faces while they attempted to hold the crowd back with batons. Unlike Mr. Rusyn, Mr. Stotts indeed led the crowd in its push against the officers, who three times had to push Mr. Stotts back. *Id.* at 5. The Government's brief then goes on for pages to describes the numerous incendiary Facebook posts by Mr. Stott in which he glorifies his actions and defiantly blamed police for being on the wrong side. He made statements that the siege was no over even though police had successfully removed them from the building. *Id.* at 6-8. Mr. Stotts also had a prior criminal record which included at least one violation of probation. *Id.* at 11-12. The judge sentenced Mr. Stotts to 24 months of probation and 60 days of home confinement.

The facts that meaningfully distinguish Mr. Stott's case from Mr. Rusyn's are those that make Mr. Stott's case *more* serious: Mr. Stott's entry into the building was more aggressive (scaling the wall); his conduct in the building was more confrontational (he led the group pushing against offers who had to push him back three times); and he made several public social media posts after he 6th that evidenced his lack of remorse.

Michael Rusyn made no social media posts or media appearances after being in the Capitol on January 6th. He didn't because he felt sick to his stomach for having participated at all. *See* Exhibit B (Michael Rusyn's Letter to the Court). He refused all media inquiries to talk about his involvement in the offense. In short, other than a record of misdemeanors, Mr. Rusyn's case cannot be distinguished from those cases where probation was imposed notwithstanding far less evidence of remorse and similar or more concerning conduct within the building. This Court should sentence Mr. Rusyn to probation with a period of home confinement (with allowances for work and seeing his children) so as not to create unwarranted sentencing disparities among similarly situated defendants.

**D. Mr. Rusyn is serious about getting mental health treatment.**

Lastly, the defense asks the Court to consider Mr. Rusyn's genuine desire for mental health treatment in determining that probation is the appropriate sentence here. Mr. Rusyn has found a therapist and has begun treatment at Counseling and Wellness Scranton. He has had his first appointment on December 22, 2021. Mr. Rusyn's willingness to tend to his mental health issues – including anxious and depressed feelings brought on more severely by seeing the impact of his actions on his children -- and the need for continuity of treatment militate in favor of a sentence of probation.

Respectfully Submitted,

Andrea Dechenne Bergman
Assistant Federal Public Defender
Counsel for Michael Rusyn