```
 1                  IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2

 3     United States of America,      ) Criminal Action
                                      ) No. 21-cr-303
 4                    Plaintiff,      )
                                      ) SENTENCING HEARING
 5     vs.                            ) BY VIDEO
                                      )
 6     Michael Joseph Rusyn,          ) Washington, DC
                                      ) January 11, 2022
 7                    Defendant.      ) Time:  2:00 p.m.
       _____
 8
                     TRANSCRIPT OF SENTENCING HEARING
 9                           HELD BEFORE
               THE HONORABLE JUDGE AMY BERMAN JACKSON
10                   UNITED STATES DISTRICT JUDGE

11     _____

                       A P P E A R A N C E S
12
       For Plaintiff:     Michael Romano
13                        James Pearce
                          U.S. Department of Justice
14                        1331 F Street, NW
                          Washington, DC  20004
15                        Email:  Michael.romano@usdoj.gov

16     For Defendant:     Andrea Bergman
                          Assistant Federal Public Defender
17                        22 South Clinton Avenue
                          Station Plaza 4, Fourth Floor
18                        Trenton, NJ  08609
                          Email:  Andrea_bergman@fd.org
19     _____

20     Court Reporter:        Janice E. Dickman, RMR, CRR, CRC
                              Official Court Reporter
21                            United States Courthouse, Room 6523
                              333 Constitution Avenue, NW
22                            Washington, DC  20001
                              202-354-3267
23

24

25
```

1              THE COURTROOM DEPUTY:  Your Honor, this afternoon,

2     this is scheduled as a video sentencing proceeding.  We have in

3     front of us criminal case No. 21-303-1, the United States of

4     America V. Michael Joseph Rusyn.

5              Will the probation officer please identify herself

6     for the record?

7              THE PROBATION OFFICER:  Good afternoon, Your Honor.

8     Jessica Reichler on behalf of the United States Probation

9     Office.

10             THE COURT:  Good afternoon.

11             THE COURTROOM DEPUTY:  Counsel for the government,

12    please identify yourself and your colleague for the record.

13             MR. ROMANO:  Good afternoon, Your Honor.  Michael

14    Romano on behalf of the United States.  I'm joined today by

15    James Pearce.

16             THE COURT:  Good afternoon.

17             THE COURTROOM DEPUTY:  Counsel for the defendant,

18    please identify yourself for the record.

19             MS. BERGMAN:  Good afternoon, Your Honor.  Andrea

20    Bergman, Assistant Federal Public Defender, appearing on behalf

21    of Mr. Rusyn.

22             THE COURT:  Good afternoon.

23             THE COURTROOM DEPUTY:  Will the defendant state his

24    name for the record and verify that he is able to see and hear

25    the judge, the probation officer and the attorneys.

```
 1              THE DEFENDANT:  Good afternoon, Your Honor.  I'm
 2    Michael Joseph Rusyn.  And, yes, I can.
 3              THE COURT:  All right.  Now, I want to say that we're
 4    here this afternoon for Mr. Rusyn's sentencing.  I understand
 5    that members of the public and the press may be listening in on
 6    our public line, which they have an absolute right to do and
 7    you're welcome to attend and report on what transpires in court
 8    proceedings, just as you would be if the courtroom were open.
 9    But I do want to remind you that just as if the courtroom were
10    open, the recording or dissemination of a recording of these
11    proceedings would be a violation of our court rules.
12              Second thing I want to talk about before we move
13    forward is to ask you, Ms. Bergman, whether you've consulted
14    with the defendant about whether he wishes to proceed by video
15    conference this afternoon?
16              MS. BERGMAN:  Yes, Your Honor.  I have consulted with
17    Mr. Rusyn about that and we are prepared to go forward by
18    video.
19              THE COURT:  All right.  And, Mr. Rusyn, do you agree
20    with that?  You understand you have a constitutional right to
21    be in the courtroom, in person, at a critical stage in your
22    case, and this is one of those.  And do you agree to
23    participate by video this afternoon?
24              THE DEFENDANT:  Yes, Your Honor.  I understand and I
25    do agree.
```

1          THE COURT:  All right.  And I find, pursuant to the

2     CARES Act, and given your written waiver and the standing order

3     of this Court calling for remote proceedings, particularly now

4     in order to protect the health and safety of you, and also the

5     court personnel and the lawyers involved, that these are all

6     specific reasons why the sentencing in this case can't be

7     further delayed without serious harm to the interest of

8     justice.

9          I just want to start by saying that I really

10     appreciate the quick work and responsiveness on the part of the

11     parties and the probation office in answering a question that I

12     posed for the first time this morning.  I have, as you are

13     probably aware, a number of these sentencings going on at the

14     same time and in another case the government took the position,

15     for the first time, it had been arguing that I could put

16     someone on probation after incarceration, even though I can't

17     put someone on supervised release after incarceration.  And

18     since it sensed some resistance on my part to that concept, it

19     offered up a short period of intermittent incarceration, but it

20     proposed up to 14 days for that.

21          I think everybody agrees and everyone knows that if

22     the defendant is placed on probation under 18 U.S. Code § 3563,

23     the Court has the discretion to impose intermittent confinement

24     or confinement in a community correctional facility as a

25     condition of probation, that's not really an issue.  But I was

1    interested in how you interpret the notion of an interval under

2    that provision, the intermittent confinement provision, and

3    what you thought of the 14 days.

4         I very much appreciated the detail and the

5    thoughtfulness that went into the letter from the federal

6    public defender that was turned around on an incredibly short

7    period of time.  But I think at this point it's fair to say

8    that the defense doesn't dispute that I have the authority to

9    do that.  What your dispute is, whether that would be the

10    appropriate thing to do under the circumstances.

11         Is that a fair compressed summary of your letter,

12    Ms. Bergman?

13         MS. BERGMAN:  I think that I should probably clarify

14    that.  I think that if you interpret the statute faithfully,

15    that you have to give the operative word "intermittent" its

16    due.  And that if the intent is to do a 14-day consecutively-

17    served period of days, that that is not intermittent.  And that

18    when we look to the purpose of that special condition of

19    probation, with Congress's intent being to, one, make it the

20    least restrictive on the defendant and provide for the Court's

21    other concerns, which might be whether or not the defendant was

22    able to keep his appointments or meet other family obligations

23    and that kind of thing, that it might become more fact-specific

24    what that length of -- or, interval might be, when you look at

25    the statute and the purpose of the statute.

1          And, so, I would suggest, in Mr. Rusyn's case, that

2     14 days -- because he would lose his employment -- that that

3     would not be an appropriate reading of the statute or an

4     appropriate interval because it's not, in fact, intermittent

5     and it would do violence, I think, to the spirit of the

6     statute.

7          I also think that it would appear to be an end run

8     around 3551's command that the Court has separate options, in

9     the disjunctive, either to impose periods of incarceration or

10    impose probation, and that --

11         THE COURT:  I don't disagree with you that the term

12    "intermittent" has to mean something.  I guess what I was

13    really trying to figure out, whether -- what the upper boundary

14    was of an interval, presuming that the Court gave a sentence

15    that appropriately had intervals in this situation.  And I

16    don't want to get ahead of myself here or suggest that's what

17    I'm planning to do.

18         But, there are sentences where a sentence of

19    incarceration of 30 days, 60 days, 90 days can be appropriate

20    for individuals who are also working, or for other reasons you

21    wouldn't want to give up the option of other forms of

22    supervision or to remove them from the community entirely for

23    that period of time.  But I had never seen an intermittent

24    sentence for anything other than weekends.

25         So, it was the length of the 14 days that struck me,

1    but I absolutely take your point about the fact that if you

2    just make it 14 in a lump, doesn't sound very intermittent.

3              MS. BERGMAN:  Right.

4              THE COURT:  Mr. Pearce, I think you're here for this

5    issue.  Is there anything you want to add about this before I

6    go forward?

7              MR. PEARCE:  Certainly.  Thank you, Your Honor.  The

8    word "intermittent," of course, does not appear in 3563(b)(10).

9    As Your Honor quoted, it talks about nights, weekends and other

10   intervals of time.  And so then the question really becomes

11   what does "other intervals of time" mean?  And I think Your

12   Honor laid out where at least a handful of district courts

13   interpreting this provision have said, kind of, that you could

14   not have more than 60 days, 90 days, 30 days, even, as one

15   consecutive lump.

16             But, one of those courts, the *Mize* court, the

17   decision, I think, out of the District of Kansas, quoted the

18   legislative history, which I think is useful here.  And,

19   specifically, what 3563 -- at the time it was enacted it was

20   (b)(11), now it's (b)(10) -- sets out are both the opportunity

21   for the courts to impose intermittent confinement, what I think

22   the legislative history referred to as split intervals, as well

23   as a brief period of time, and the Senate report suggests up to

24   a week or two.

25             And so in our reading of that, you either can do

1    intermittent or you can do a brief period of time.  We

2    certainly recognize that consistent with what the cases have

3    held -- frankly, we think once you get above 14 days, that's

4    not a brief interval of time or a brief period of time.  But

5    we've do believe, consistent with the legislative history and

6    the statute's history, that 14 days is permissible under

7    3563(b)(10).

8              THE COURT:  All right.  The other issue that we're

9    facing is that while we can have an academic conversation about

10   this, no matter which way it comes out you have to deal with

11   the practical realities of what would be available in the

12   district in which the defendant is going to be sentenced.  And

13   even if there were facilities that were prepared to accept

14   probationers under the kinds of sentences that are being

15   discussed, whether those exist now and whether those options

16   are either compromised or limited or eliminated entirely due to

17   the presence of the coronavirus in the community and in the

18   facility at large.

19             So there's a lot to think about legally and

20   practically in terms of what we can do with sentencing.  I

21   think it's important to think about all this in connection with

22   this series of misdemeanors.  The Court is probably doing more

23   misdemeanor sentencing than it's ever done before in this

24   building in -- at least in this volume.  So, it's useful to

25   know what some of these options are.  But then it still may

 1    turn out that they're not options.

 2            So what I think is more important to do is to go

 3    forward now and discuss what we ordinarily would discuss, which

 4    is the sentencing factors.  And so I would like to get into the

 5    substance of the sentencing directly.

 6            First, I would say, for the record, that I received

 7    the final revised presentence report, and it was filed on

 8    December 8th.  Ms. Bergman, have both and you Mr. Rusyn had an

 9    opportunity read the presentence report?

10            MS. BERGMAN:  Yes, Your Honor, we have.  We did

11    identify one correction to be made at paragraph 35 with respect

12    to what sentence was actually imposed in that prior matter for

13    Mr. Rusyn.  In an email received from the probation department

14    yesterday, I understand that the probation department is in

15    agreement that the correction should be made.  I don't know if

16    that was yet communicated to the Court.

17            THE COURT:  All right.  I did note that you had that

18    objection.  And with that correction, then, do you have any

19    objections to the presentence report at this point?

20            MS. BERGMAN:  No, Your Honor.

21            THE COURT:  All right.  And I don't believe the

22    government has any factual or legal objections to the

23    presentence report either.

24            MR. ROMANO:  We do not, Your Honor.

25            THE COURT:  Okay.  So with that correction, I'm going

1    to accept the presentence report as undisputed.

2         I've also received additional materials concerning

3    the defendant, including the government's memorandum in aid of

4    sentencing and a video and some photographs from January 6th;

5    the defendant's memorandum in aid of sentencing; his academic

6    records that reflected struggles with learning issues as a

7    young man; a letter from his great aunt who told me a great

8    deal about his character, in particular, his role in supporting

9    his elderly grandmother; a letter from a fellow volunteer

10   firefighter; a letter from another parent, one of his

11   daughter's best friends, who have witnessed the defendant's

12   love of and commitment to his daughters.

13        A letter from a parent who witnessed interest in his

14   daughters' little league activities, and ultimately recruited

15   him to be a coach himself, who talks about his maturity and

16   composure; another parent interested in sharing softball

17   coaching duties, and; the defendant's father, who was worried

18   that maybe he had a conflict of interest.  But he's a person

19   who knows the defendant quite well and he had valuable things

20   to say.  He wrote about not only Mr. Rusyn's extraordinary

21   efforts caring for his grandmother, but the way he stepped up

22   to help raise his younger brothers when his mother passed away.

23        There were also supplemental submissions from the

24   defense regarding information regarding his new employment and

25   recent injury sustained during heroic efforts to fight a fire

1   and saved one of the members -- one of his subordinates.  I

2   also received a letter from counsel that dealt with the prior

3   assault conviction, which we've now addressed through the

4   probation report.

5           I would note -- and I wasn't going to say anything

6   about this in connection with today's letter, given the

7   turnaround -- our local rules actually require docketed

8   submissions and not letters to the Court.  So if you have other

9   cases, just keep that in mind.

10          Finally, I received a letter from the defendant

11  himself.  And I read and very much appreciated all of that.

12          In a criminal case, as I said at the time you pled

13  guilty, there's a statute that tells me the things I'm supposed

14  to think about when I sentence someone, it's 18 U.S. Code

15  § 3553.  It list a number of factors that we're supposed to

16  think about, and one of the things it tells me you're supposed

17  to think about is what the sentencing guidelines would

18  recommend in your case.  But the parties have all agreed that

19  given the plea to the misdemeanor charge of parading,

20  demonstrating, or picketing in a Capitol building, in violation

21  of 40 U.S. Code § 5104(e)(2)(G), that is the type of

22  misdemeanor to which the guidelines do not apply, and so we

23  don't have to talk about them or calculate them or think about

24  them.  However, what we do know is that for this offense

25  Congress has said that the maximum sentence that could be

1     imposed would be up to six months.

2           Would the government like an opportunity to speak

3     regarding the appropriate sentence in this case?

4           MR. ROMANO:  We would, Your Honor.

5           THE COURT:  All right.  Go ahead, Mr. Romano.

6           MR. ROMANO:  Thank you.  So, Your Honor, I don't --

7     I'll begin by noting that we've argued in this case, as we've

8     argued in other cases arising out of the riot on January 6,

9     that the scope of the riot and the presence of numerous people

10    who participated in it, whether they committed conduct that was

11    charged by misdemeanors or felonies, enabled the riot to

12    persist for the length of time that it did, enabled the

13    violence that took place during that day, and contributed to a

14    criminal offense of historic proportions.

15          We treat the riot very seriously, and the defense

16    does as well.  The defense acknowledges that the size of the

17    riot made the riot more dangerous, made this a significant

18    criminal offense.  There are several areas where we and the

19    defense disagree.  I want to highlight those.

20          I actually want to begin, though, by addressing the

21    defendant's points about his own personal history in relation

22    to his family, his children, and his care of his grandmother.

23          These absolutely are to his credit, Your Honor.  His

24    commitment to his children, his commitment to be an active

25    parent, to work hard at getting education, provide a good

1    education to his children, they're all to his credit, they're

2    worthy of consideration.  There's one point that I thought was

3    especially important for me to highlight in the defendant's

4    memorandum, that his -- that speaks well of him.  He wrote of

5    having been ashamed of participating in the events of January

6    6th.  He noted that he believed his daughters had lost faith in

7    him.  One of his daughters told him she has difficulty trusting

8    him after the events of January 6.  I'm sure that was

9    tremendously difficult for the defendant to hear.  I'm sure it

10   was difficult for him to engage with.

11        But, it's important that he's having conversations

12   like this with his children and others.  It's important that

13   he's working, as he's demonstrated through Ms. Bergman's

14   arguments, to better himself, to work with a therapist, to care

15   for his grandmother, to find gainful employment.  Again, it

16   also sounds like he is separating himself from people in groups

17   that encouraged the sort of conspiratorial thinking and the

18   behavior that led to the crimes on January 6.  And this is what

19   we would hope any person coming before the Court for sentencing

20   would do.

21        But, I think the Court is well aware that not all

22   defendants in January 6 matters are doing this.  There are

23   certainly some that are becoming more entrenched, there are

24   some that are refusing to engage.  There may be an ecosystem

25   that will allow people to continue to buy into conspiracy

1    theories.  The work the defendant is doing to separate himself

2    is noteworthy and I think deserves our acknowledgment.

3          The area we largely disagree with the defense is our

4    interpretation of the defendant's conduct that day.  And

5    reading the defendant's memorandum, I was struck by some things

6    that when I put them next to each other, did not appear to make

7    sense to me.  On the one hand, the defendant acknowledged that

8    the riot was serious.  He wrote in his letter to the court

9    that, "After my first few footsteps, I had a terrible feeling

10   about this and I should have known that nothing good could

11   happen."  In his original sentencing memorandum he wrote that

12   he was ashamed of himself in the immediate aftermath of the

13   events of January 6th.

14         But, reading both the original and the supplemental

15   sentencing memorandum, in my view, Your Honor, fails to answer

16   the question of why?  Why he had that terrible feeling, why he

17   was ashamed of himself immediately.  And, of course, all of us

18   here virtually today for this hearing know that the conduct was

19   wrong and understand that it was wrong and criminal.  But to

20   read the defendant's sentencing memorandum, it sounds like he

21   was oblivious to what was going on around him.

22         He claims that he didn't see how the building's doors

23   were opened, that he was forced inside the Capitol building,

24   that he didn't see the group of people inside the statuary hall

25   connector, just outside of the house chamber, pushing against

1    the police line.  So, based on what he describes of his

2    conduct, it's not clear how or why he came to the understanding

3    of the seriousness of what he did.

4         Now, it's the government's view that his statements

5    about not seeing these things and not understanding these

6    things are not credible and that the Court shouldn't credit

7    those statements.  The defendant claims he didn't see how the

8    door on the east side of the Capitol building leading into the

9    rotunda was breached.  And, in a way, that statement could be

10   read as true because the door was opened from the inside.  But

11   he was at the doors and close enough to the front of the crowd

12   to be able to see them.

13        Exhibits 2 and 3, which we submitted with our

14   sentencing memorandum, show that he was using his phone to film

15   these doors for a full ten minutes before other rioters at the

16   front of the crowd tried to break through them.  Other videos

17   that we highlighted for the Court show clashes between other

18   rioters and police officers right there at the door.

19        So, for the length of time that rioters were trying

20   to break into the Capitol, he was there.  Breaking in wasn't a

21   fast process either, as we identified in our sentencing

22   memorandum; it was four minutes from the time the rioters first

23   broke parts of the glass, when somebody inside the building got

24   those doors open.  So, if the defendant was standing in the

25   crowd recording those doors and watching for a period of 14

1  minutes, and hearing and watching as other rioters clashed with

2  police, he, of course, would have understood the violent nature

3  of this event before he ever stepped foot inside the building.

4  It would have been inescapable, it boggles the mind, Your

5  Honor, to think that he wouldn't have known what was going on

6  around him.

7         I want to highlight one piece of evidence that we

8  didn't submit, and this was something that came to our

9  attention after we filed our original sentencing memorandum and

10  which I informed Ms. Bergman about.  There were a handful of

11  videos recovered from the defendant's phone that initially did

12  not appear to be videos, it was sent after.  We dug a little

13  deeper and we found that these files that appeared to be

14  nothing were actually videos.  I informed Ms. Bergman about

15  this and her legal assistant as soon as we found out.

16         There is a video -- if the Court would find it

17  useful, I would be happy to share my screen and show it -- and

18  it is from the defendant's cell phone of that door that shows

19  the spiderweb fractures in the window as other rioters were

20  trying to break in.

21         So, again, it makes no sense that he didn't know that

22  this was happening.  And I think, even without consideration of

23  that video, the Court can tell this based on the totality of

24  the circumstances and the other exhibits that we've submitted.

25         So, now we move to the defendant's point that he

1    claims he was forced into the Capitol against his will.  And if

2    there was any risk of him being trampled by the crowd, it was

3    only because he put himself at the front of the crowd and

4    remained there for 14 minutes while other people were trying to

5    break into the building.

6           The claim doesn't make sense, Your Honor.  And as the

7    Court can see from the videos we submitted from the U.S.

8    Capitol police security footage taken from inside the building,

9    when the defendant got in he certainly didn't act like a person

10   who was forced inside.  He didn't take any time to collect his

11   bearings, he didn't take any time to process what had just

12   happened to him.  He didn't look around in confusion and try to

13   make sense of where he was.  He and Deborah Lee, who he was

14   with, continued forward.

15          Next, the defendant and Ms. Lee moved through the

16   rotunda to the statuary hall connector.  That's the room beyond

17   the statuary hall that has a number of statues of people from

18   different states that leads up to the House of Representatives

19   chamber.  Now, there again, he would have been in a position to

20   see and hear what was going on.  The defense and the government

21   agree that he was a few rows of people back from the front of

22   the crowd.  But, in our view, he was not so far back that his

23   view would have been obstructed.

24          The defense and I disagree about whether or not he

25   would have heard one of the people at the front of that crowd

1    yell the phrase, "Tell Speaker Pelosi we're coming for that

2    bitch."  The video shows that she said this at around the time

3    that Mr. Rusyn arrived in the statuary hall connector.  And it

4    was not, at that time, so crowded that there was a mass of

5    people and wall to wall, but it's possible that he didn't hear.

6         Nonetheless, even if he didn't hear that, he would

7    have heard people call police officers traitors, he would have

8    heard people swear at police officers, he would have heard

9    people demand to be let past the police line.

10        You can tell he heard and was generally aware of what

11   was going on because the video makes abundantly clear that he

12   at one point stood at the front of the crowd and joined in a

13   "We want Trump" chant.  And, again, he can be picked up in

14   other pieces of video, not very far from the back of the crowd,

15   in a position to see and hear what was going on.

16        Next, after he pressed through that group, he was

17   part of a crowd that reached the house antechamber.  And there,

18   as anywhere else, there's no indication that Mr. Rusyn was

19   violent.  But there were people in that antechamber who were

20   calling to have the window leading into the House chamber

21   smashed in.  The photo that we submitted that has people on the

22   other side, the video shows people in defense of the

23   representatives in the House chamber having barricaded that

24   door, holding guns on the other side of the window and on the

25   side of the chamber where Mr. Rusyn was.  There were people who

1    were calling for parts of body armor or crowbars to smash in

2    the window.  That is audible on the video taken by

3    Mr. Sullivan, another defendant in one of these rioting cases.

4    And at times Mr. Sullivan was standing right next to Mr. Rusyn.

5    Again, it makes no sense to think that he didn't understand

6    what the crowd was trying to do.

7         There's also another moment that, again, appears on a

8    video that I didn't share with the Court for the same reasons.

9    And if it would be useful, I would be happy to share it now.

10   But, otherwise, I'll just proffer it is, again, from the

11   defendant's phone.  This is from the rotunda.  It's from a

12   period of time after which it's difficult to see, from the

13   rotunda security footage, where he went.

14        And there is a video of the defendant filming a third

15   attempt by other rioters to get through a police line.  There,

16   those police officers stood in front of a door that led from

17   the rotunda to a set of stairs.  I believe, but I'm not

18   certain, that those stairs led down from the rotunda into the

19   area where police officers were staging to defend the tunnel at

20   the lower west terrace, that I'm sure the Court is familiar

21   with through other cases.  And for over a period of several

22   minutes there were rioters yelling at those police officers,

23   pushing against those police officers.  And the defendant,

24   again, did not push police officers himself, but stood right

25   there at the front of the crowd and filmed other rioters doing

1    that.

2         Then, we submit that Deborah Lee's statements after

3    the defendant and she left the Capitol were revealed.  I know

4    in his sentencing memorandum he distances himself from

5    statements that Ms. Lee made and says he did not agree with

6    them, but that day the statements that we quoted came right

7    after he and she had left the Capitol, right after a period of

8    time when their conduct within the Capitol was largely

9    identical, where it is fair to infer that there was a unity of

10   purpose that day, even if he came to a point later where he

11   didn't agree with her.

12        All of this evidence taken in conjunction shows that

13   he was a willing participant.  And so, this speaks to a point

14   about the nature and circumstances of the offense, but also the

15   history and characteristics of the defendant.  It speaks to the

16   nature and circumstances of the offense because it shows that

17   the defendant's conduct was more serious than that of a number

18   of other people who were in the building that day.  It shows

19   that he lent his presence to groups of people, several times,

20   who were trying to penetrate police lines, even if he didn't

21   engage in physical violence himself.  And it speaks to the

22   history and circumstances of this particular defendant in

23   thinking about acceptance of responsibility and accountability.

24        The defendant absolutely has accepted responsibility

25   by pleading guilty.  He's acknowledged the factual nature of

1    what he did and he is doing the work to repair the

2    relationships damaged by his participation in January 6th, but

3    it doesn't appear that he is acknowledging the gravity of his

4    actions or a full understanding of what he would have seen and

5    known.

6            It is unlikely, Your Honor, that he went into the

7    Capitol completely oblivious to what was going on around him

8    but, nonetheless, immediately came to an understanding that it

9    was problematic.  It's much more likely, and we think the

10   evidence shows, that he shared a common goal with other rioters

11   and he wanted to be part of the goal that they were trying to

12   achieve, even if he was not willing to use violence to achieve

13   it.  And it was after leaving and after thinking back on the

14   things that he had seen and had done and had known that he

15   realized how wrongful and problematic his conduct and other

16   people's conduct were.  That explanation, we submit, makes much

17   more sense.

18           Lastly, I want to talk about the issue of sentencing

19   disparities.  The defense raises a number of cases that they

20   view as comparable, the government does not.  I'm happy to

21   speak to specific cases, if it would be helpful to the Court.

22   But I think there are two general points that I take away from

23   the defendant's discussion of comparable cases.

24           One is that it seems that the defense has a view that

25   the thing that is an aggravating factor in misdemeanor cases is

1   bragging about the riot on social media or spreading lies about

2   the election.  To be clear, that is an aggravating factor, the

3   government has argued it is an aggravating factor in a number

4   of cases, but it is not the only aggravating factor.  So the

5   government submits that it is incorrect to look at the

6   defendant's conduct and look at the conduct of somebody who is

7   more a loudmouth and say the conduct of somebody who was more a

8   loudmouth is categorically worse.

9         The defendant did not participate in the kind of

10   disinformation or bragging on social media that other rioters

11   did.  That is clear.  But, his conduct in the Capitol, lending

12   his support to efforts to breach police lines, watching as

13   other people breached police lines, and be a part of that

14   numerous times and trying to record those interactions is

15   problematic in a way that other defendants' conduct is not.

16         And I think I rolled up both of the points that I was

17   going to make about comparable cases into one, so if it would

18   be helpful to the Court to hear the government discuss any

19   particular cases that the defense cited, I would be happy to do

20   so.  But, otherwise, I would rest my argument there and, again,

21   ask Your Honor that the Court impose a sentence of 45 days of

22   straight time, which the government submits is warranted given

23   the nature of the conduct in this case.

24         THE COURT:  Okay.  Thank you.  I'm not sure, I think

25   when you have to compare these cases, the need to avoid

1    unwarranted sentencing disparities, you have to look at these

2    cases writ large.  What are the cases that are generally moving

3    in the direction of probation?  What are the ones that are

4    generally moving in the direction of incarceration?  And

5    there's going to be outliers on both sides, there's going to be

6    individual factors that we can't tell just from the sentence,

7    what it was that moved a particular judge to go one way or the

8    other.

9         There's going to be multiple sentences that any judge

10   in the courthouse might have handled differently in that

11   particular sentence than the judge assigned, either a harsher

12   sentence or a lighter sentence.  So, really, you have to see

13   what the picture is as a whole.  And I'm happy to have people

14   point out particular sentences to me, but I think it's

15   important, really, to focus more on what this defendant did and

16   what this defendant deserves under all of the sentencing

17   factors.

18        And, so, with that, Ms. Bergman, I would like to hear

19   from you on the defendant's behalf.  And one of the things you

20   do mention frequently is the impact a sentence would have on

21   his job.  So, you said that with some certainty at various

22   points, so I would like to know more about that.  But, also, if

23   I end up crafting something that has him at home but home

24   confinement, I want to know, before you're finished, what his

25   schedule is in terms of when he goes to work in the morning,

1     and the same thing with the fire station.

2          MS. BERGMAN:  Thank you, Your Honor.  First, you

3     know, we've submitted comprehensive briefing.  I'm not going to

4     belabor most of the points that I've set forth in the papers

5     that have been submitted to the Court, which I know Your Honor

6     has gone over very carefully.

7          I will say that I think that, with due respect to

8     Mr. Romano, he overstates the point that I was attempting to

9     make for Mr. Rusyn with respect to the nature and circumstances

10    of the offense and his particular remorse or realization very

11    soon after coming out of the Capitol about how serious his

12    participation in the riot was.  I don't think I ever suggested

13    that Mr. Rusyn was oblivious to what was going on around him

14    before he went into the building.

15         I do think it was extremely chaotic, that a lot of

16    people were using their cell phones over their heads to capture

17    video that they didn't necessarily even see, but only later,

18    looking at their own video, were able to see.  I'm not

19    suggesting in this particular case or pointing to a particular

20    piece of video in Mr. Rusyn's case, I'm just saying that he

21    would acknowledge, before he went into the building, that he

22    shouldn't have been there and that it was wrong to go in.

23         It is equally true that, given the chaos of the

24    situation and having seen other people be trampled on that

25    staircase, that he held that fear before going in.  I think

1    that that's what he was trying to convey to the FBI, when he

2    was initially interviewed by them.  But, he has always said,

3    from the beginning, that if that was truly the only concern,

4    that he would have been able to find his way out of the

5    building before going further, and that he acknowledges the

6    wrongdoing at every moment that he stayed in the building.

7            The real point that I was hoping to make for the

8    Court is because these sentences require such an individualized

9    evaluation, not just the individual's conduct in the building,

10   but all of the 3553(a) factors, that we have someone who had

11   been at the Capitol a couple months prior and really

12   appreciated the historical significance of the city and the

13   building.  I think I mentioned he brought souvenirs home for

14   his kids on that particular occasion.  And that it is perhaps

15   why, very shortly after coming out of the building, that he was

16   really overwhelmed by this sense of remorse, notwithstanding

17   his participation.

18           But an individualized assessment, I think, has to

19   take into consideration not just what the person's acts were,

20   or assume that an opportunity to observe something is the same

21   or as culpable as someone who was engaging in the kind of

22   conduct.  So, for instance, of pushing through the police line

23   or, you know, holding a makeshift weapon, you know, those kinds

24   of things.  So that was really the only point that I was trying

25   to make with respect to distinguishing the offense conduct for

1   Mr. Rusyn.

2           I really want to speak about the distinguishing

3   personal history and characteristics that I think ultimately

4   are important for this Court to pay attention to, especially as

5   it pertains to disparity in sentencing.

6           I agree that just the sheer number of these cases

7   right now, that we are starting to see what appear to be

8   inconsistencies, different judges are viewing facts in

9   different ways and that it is hard to make one-to-one

10   comparisons with cases.  But, you know, the 3553(a) says that

11   the Court has to consider disparity in sentencing, and the way

12   to do that is learned.

13           I look at what appear to be similarly situated

14   defendants, whether it's offense conduct or some other factor.

15   And that, you know, my second letter to the Court was really

16   about whether a probationary sentence was necessary because

17   when you look at some of the factual underpinnings of the cases

18   where some individuals got probation, that it's hard to

19   distinguish Mr. Rusyn's from those cases, and that there would

20   be a disparity in sentencing if Mr. Rusyn were not to get

21   probation.

22           And, you know, conversely, that if the Court were to

23   determine that the offense conduct in the building warranted

24   some more severe imposition of sentence than a probationary

25   sentence, that there is basis here for a warranted disparity at

1    sentencing, and that those factors, particularly with respect

2    to Mr. Rusyn's devotion to the community, his long history of

3    community service -- I detailed, you know, just coincidentally,

4    this fire that happened on December 12th in Olyphant,

5    Pennsylvania, where Mr. Rusyn was seriously injured in his

6    capacity as a volunteer firefighter, that those kinds of

7    factors that are personal to Mr. Rusyn would outweigh, in

8    comparison to the nature and circumstances of the offense

9    conduct, would, you know, I think, provide a basis for this

10   Court to determine that there's a warranted disparity in

11   sentencing Mr. Rusyn to probation.

12          And there are other, of course, factors that I

13   presented to the Court; the issue of his employment, the issue

14   of his taking care of his grandmother, who would otherwise be

15   in a nursing home if it were not for his decision to move from

16   his father's house to her home to care for her.  And, you know,

17   being, of course, the Court is well aware of what his

18   commitments are to his children.

19          So, I want, then, to answer this Court's specific

20   questions about his schedule.  As I understand it, the current

21   schedule is 7 a.m. to 3 p.m., there is some overtime.  I

22   honestly don't know the answer to the question of whether or

23   not that overtime is a schedule that he gets, you know,

24   initially, at the beginning of the week, or if it's a more

25   ad hoc thing, on a day-to-day basis.  But it's my understanding

1    that his standard hours are Monday through Friday from 7 a.m.

2    to 3 p.m., or 7:30 to 3:30, if I'm correct.

3           And with respect to the children, I believe that he

4    sees them on weekends and one day during the week, as I

5    understand it, although I don't know that that is necessarily a

6    schedule that is set in stone.  I think that he would be able

7    to work with the probation department, if he were placed on

8    probation, to set a schedule that was appropriate, especially

9    if the Court accedes to the request to give him 30 days of

10   house arrest, which is the incremental penalty that I have

11   suggested is the more appropriate one, given the particular

12   offense conduct and, you know, perhaps Mr. Rusyn's history of

13   misdemeanor convictions, which might differentiate himself, if

14   I'm candid with the court, to some of these other cases.

15          But, with that home confinement provision, that would

16   allow him out for purposes of work, that he would be able to

17   work with the probation department to set a set schedule for

18   him to see his children, as well.  I don't know if that answers

19   the Court's particular question.

20          THE COURT:  No, I think that's helpful.  Is there

21   anything else you wanted to say before I turn to Mr. Rusyn

22   himself?

23          MS. BERGMAN:  I'll just make one last comment about

24   the social media piece of it, because I think it goes not just

25   to the disparity in sentencing, but also to the acceptance of

1   responsibility.  And that's something the government has sort

2   of hammered hard on, about questioning the sincerity of his

3   acceptance of responsibility.  And I think that it is pretty

4   good corroborating evidence that he felt very remorseful in the

5   immediate aftermath of the events of January 6th because he did

6   completely disassociate himself from others that he knew, like

7   Ms. Lee, and also completely shut down any activity on his own

8   social media.  And that was the only point that I wished to

9   make with respect to that.

10          THE COURT:  All right.  Mr. Rusyn, this is your

11   opportunity, if there's anything you would like to say to me

12   that I should consider before I impose sentence in your case.

13          THE DEFENDANT:  Thank you, Your Honor.  Your Honor, I

14   would like to start by saying I'm sorry.  And I apologize and I

15   would like to take this time to express my remorse on this

16   terrible situation.  This was not my intentions, but

17   understanding the wrong that I have done, along with the impact

18   that it has on me, but more importantly, my family, my friends,

19   my loved ones.  I'm full of regrets and I'm full of shame.

20          Moving on into the future, I plan to continue to live

21   with my grandmother and being my grandmother's caretaker and

22   provider for all of her needs.  I call my daughters every

23   morning to make sure they are up and getting ready for school,

24   along with making the bus on time, making sure that they were

25   doing their homework and studies, making sure they understand

1   the work to help pick up their grades.  Spending as much time

2   as I can with them as possible.  Within the few days to come,

3   signing Mikaila and Nadia, my daughters, up for softball and

4   taking on the role of being head coach.  This year will be

5   quite the challenge, as they will be in different leagues; high

6   school and youth.  Be a provider, making sure they have

7   everything they need, along with transportation, practices,

8   games, pitching and batting lessons through a private

9   instructor.

10          I plan to further my education for my career with the

11  union pipe fitters, welders program.  I have worked very hard

12  to be where I am today.  I went through five years of school,

13  apprenticeship, to become a journeyman and I want to continue

14  to climb the ladder to be, some day, a foreman, a general

15  foreman, a superintendent, and be able to run work, along with

16  helping out my community and giving back any way possible.  And

17  I have enrolled in counseling classes, which I find help very

18  much, and will continue with counseling.

19          Thank you for this opportunity, Your Honor.

20          THE COURT:  All right.  Thank you very much,

21  Mr. Rusyn.

22          I've heard a lot and it's hard to harmonize all of it

23  because the personal qualities point in one direction and the

24  events of the day point in another.  And I want to take a few

25  moments to leave the bench and put everything together in my

1  mind before I tell you what your sentence is going to be.  I'm

2  going to ask everybody to just stay connected so we don't lose

3  this well-attended Zoom proceeding that we have right now,

4  where we haven't lost anyone, frozen anyone yet.  And I will

5  probably be back in about ten minutes.  So thank you very much.

6          (Recess.)

7          THE COURTROOM DEPUTY:  Your Honor, recalling criminal

8  case No. 21-303-01, the *United States of America v. Michael*

9  *Joseph Rusyn*.  The probation officer is Officer Reichler.

10  Counsel for the government are Mr. Romano and Mr. Pearce.

11  Counsel for the defendant is Ms. Bergman.

12          THE COURT:  Okay.  I couldn't see her before.  I

13  wanted to make sure she was here before I went forward.

14          All right.  As I said earlier, there's a statute that

15  tells me what I'm supposed to think about when I sentence

16  someone.  It list a number of factors and I'm going to go

17  through each one of them.

18          The first thing I'm supposed to think about is the

19  nature and circumstances of the offense.  What happened?  What

20  did you do?  On January 6, 2021, you left your home in

21  Pennsylvania to attend the rally for the former President of

22  the United States.  There's nothing wrong with that.

23  Afterwards, you walked to the east side of the U.S. Capitol

24  building.  The U.S. Capitol was closed to the public while, in

25  accordance with the Constitution, a joint session of Congress

1   was convened to certify the vote of the Electoral College in

2   the 2020 presidential election.  Vice President Mike Pence, a

3   Republican, was present and presiding, as the Constitution

4   required him to do.

5            You were in the first waive of people to approach the

6   building and attempt to gain entry through the east rotunda

7   doors, which were unquestionably closed.  People began breaking

8   windows to gain entry.  You saw this.  You didn't walk away.

9   You suggested that you were going along with the crowd, but you

10  had choices.  And you could see from the very start that the

11  line had been crossed and it wasn't about listening to speeches

12  anymore.

13           Officers were unable to disperse the large crowd and

14  ultimately one of the rioters forced the doors open as others

15  engaged in combat with police on the outside and chemical spray

16  was deployed.  You were there for the entire seven minutes it

17  took for this to happen.  Apparently you were waiting to get

18  in.  There is no other explanation.

19           Eventually people forced the door open.  There were

20  officers just inside trying to keep the demonstrators out, and

21  officers outside doing the same thing.  The woman traveling

22  with you got inside the partially opened doors first and turned

23  around to take your hand so you could step over the threshold

24  as well.

25           At approximately 2:27 p.m., according to the

 1    government, you two were among the first 30 to 40 people to

 2    enter the building.  An officer was knocked to the ground at

 3    that very spot just seconds earlier and was still lying there

 4    when you walked in.  And you didn't just simply step in and

 5    then step out either.  As the government said, you didn't seem

 6    surprised to be there or confused or try to get out.  You

 7    walked through the rotunda, through the statuary hall and into

 8    the small connector leading to the main entrance to the House

 9    of Representatives chamber itself.  This is exactly where the

10    certification proceeding was taking place.

11            While you were not one of the members of the group

12    pushing through the connector, shouting threats to the speaker

13    that they were coming for her, you were right up front.  You

14    joined in the chants of "We want Trump" and you and Ms. Lee

15    were directly in front of the officers trying to hold the group

16    back.  No one is pushing you.  No one is making you go

17    anywhere.

18            There is plenty of video of your literally strolling

19    through the building arm-in-arm with Ms. Lee.  It was striking

20    to me how calm you were, notwithstanding your statements that

21    this was all something that was offensive to you.

22            The members of the unruly group swelled to the point

23    where the police line got overwhelmed and the crowd surged

24    forward into the anteroom immediately outside the chamber door.

25    Officers were telling everyone to get back.  You were in the

1   middle of this.  You're walking forward yourself, you're not

2   pulling back.  You don't bail out down a side hallway, you're

3   not listening to the officers.

4           Police and congressmen of both parties are trying to

5   barricade the door from the other side as members of the crowd

6   urged others to use various means to break it down.  This is

7   all to the refrain of "Stop the Steal."

8           The police were eventually able to get the crowd to

9   leave the immediate area with smoke canisters, but you didn't

10  leave the building then either.  You and Ms. Lee wandered into

11  the hallway, back through the rotunda, filming with your

12  cameras.  And you're still there at about 3 p.m.  And when you

13  get outside, Ms. Lee crows about it, "We F'ing did it.  It's

14  our house," while you preserve her remarks in the video you're

15  recording.

16          In sum, on that day the U.S. Capitol police officers,

17  federal law enforcement officers, doing their job, surrounding

18  the building, were overcome.  You were one of the many

19  individuals who made their way illegally into the building and

20  past the officers who were attempting to keep the crowd away

21  from the building.  You were one of the individuals who entered

22  the closed building and the certification process was

23  interrupted as members of Congress and the Vice President

24  himself had to struggle to hold the crowd back themselves or

25  were forced to hide.

1          That was the point of the trip, to disrupt the

2     process.  You can say you were only one man and only a minor

3     participant, but it took the force of a crowd, a large number

4     of people to overcome the police, to breach the building.  And

5     it couldn't have been accomplished without the power of numbers

6     and without people like you.  And the building had to be

7     cleared of the people who had not gone through security before

8     Congress could resume.  So the mere fact of remaining inside

9     put the democratic process, the constitutional proceedings that

10    were underway at risk.

11         One of the recent submissions said something to the

12    effect about being there for 11 minutes.  But I think the

13    statement of facts agree that you were there for an hour.  And

14    when we talk about disparities, most of the people that I've

15    put on probation at this point were generally people who walked

16    in and walked right out.

17         It is true, though, and it is also an aspect of the

18    nature and circumstances of this offense that you weren't a

19    person circulating violent rhetoric or whipping up enthusiasm

20    about an attack on Washington beforehand, and you didn't do

21    anything personally destructive once inside.  You didn't arm

22    yourself to come here, you didn't dress for war.  You didn't

23    break anything, you didn't hurt anyone.  And the sentence also

24    should reflect that, too.  Although, people who did those

25    things aren't generally getting probation.

1          However, while you report now that you were horrified

2     then, you didn't say or do anything to demonstrate that you

3     were chastened or shocked by the news reports afterwards, when

4     one can see the defilement and destruction that was left behind

5     and could learn what happened to so many law enforcement

6     officers, and some of the other rioters, as well.

7          You were interviewed on February 24th, after you'd

8     had more than a month to think about it, and couldn't quite

9     bring yourself to tell the truth.  You denied traveling with

10    another person, despite your obvious chumminess on the video.

11    You insisted that what you were doing was disarming other

12    people and turning their weapons over to the police and getting

13    wounded in the process.  And maybe you did discourage others or

14    removed weapons from others by turning things over to the

15    police.

16          You insisted you were swept inside by the force of

17    the crowd; it was not conscious, it was not voluntary, you were

18    just trying to keep yourself from getting trampled.  And,

19    Mr. Rusyn, I just don't think that's what the evidence shows.

20          Even the sentencing memo was still trying to advance

21    that narrative, that it was, quote, in part, close quote, true.

22    That would not begin to justify the amount of time you spent

23    inside, or where you headed once you got there.  Your lack of

24    candor, even after the benefit of time, is a troubling fact.

25          So I want to make a few things clear.  You're

1   standing before me and a sanction is warranted, in my view, but

2   not for exercising your First Amendment rights.  You're not

3   here today because you supported the former President.

4   Millions of people voted for him and didn't heed his call to

5   descend on the nation's capital.  You pled guilty to breaking

6   the law.  And you didn't get swept away and it wasn't anybody

7   else's fault.  You walked in on your own two feet, filming it

8   for posterity.

9          You were convicted because you were a participant in

10  an effort to disrupt and undo the electoral process, to

11  interrupt the certification of an election, to subvert

12  democracy -- which is based on the will of the people -- and

13  replace it with the will of the mob.  You may very well have

14  sincerely believed at the time the misinformation you'd been

15  receiving from your news sources of choice that the election

16  had been unfair and tainted.  But by that time, even the

17  Republican election officials in the challenged states had

18  said, over and over again, and more than 60 judges across the

19  country had found -- including judges appointed by both parties

20  and even some appointed by the President himself -- had said

21  over and over again that there's no evidence behind the claims.

22         Now, you've told me you've sworn off politics, but

23  that isn't the point.  I want to assure you that you did and

24  you still do have an absolute right to support whoever you want

25  to support, to rally for whoever you want to rally, and to vote

1    for whoever you want to vote for.  Acceptance of responsibility

2    in this courthouse does not require you to renounce your

3    allegiance to any candidate or any party, but it does include

4    the notion of accepting the fact that you went too far, that

5    forcing your way into the closed building and trying to force

6    your way into the House chamber itself is not being a tourist,

7    it's not being a part of history, and it doesn't honor that

8    history that you said you were so impressed with when you were

9    at the Capitol before.  It's not a political activity.  It was

10   an illegal action motivated by an illegal purpose.

11          The nature and circumstances of the offense aren't

12   the only thing I'm supposed to think about.  I'm also supposed

13   to think about the history and characteristics of the

14   defendant.  And I have received considerable information that

15   you are a decent and hard-working person, who does a great deal

16   for your family and for your community.  You are a volunteer

17   firefighter.  You understand exactly what it means to put your

18   own self in danger to serve the public.  It requires bravery

19   and it requires character.  You've been involved since you were

20   a teenager, and now you've risen to the chief's position,

21   training and managing others, and you risked your own life just

22   the other day to safe a colleague.

23          You provide much needed assistance so that your

24   elderly grandmother can live in her home and doesn't have to be

25   in a nursing home.  You live with her, you cook for her, and

1    you take her to medical appointments.  There aren't many people

2    who would step up in such a committed fashion.  You are a

3    devoted father, notwithstanding the strained relationship with

4    the mother of your two daughters.

5         You struggled academically as a boy and still

6    struggle with that self image.  But I want to tell you that the

7    various forms of construction work you've been trained to do

8    are complicated, that take years, as you said, to learn, and

9    not everybody is up to that task either.  And firefighting,

10   that's difficult, it requires a knowledge of science and

11   engineering, it requires judgment, it requires management

12   skills and split-second decision making.  It's proof that

13   whether a person has a particular sort of learning skills that

14   are suited to a classroom or not, that's not the measure of

15   whether they're smart or not.  You are obviously an intelligent

16   and capable person.  And I have to take all of that into

17   consideration.

18        But I have to tell you, it gave me pause because it

19   also points to the conclusion that you, the chief of a

20   firefighting unit, a public safety supervisor, yourself knew

21   exactly what role the officers were performing that day and

22   knew exactly why it was wrong to interfere with them.  And that

23   really bothers me.  It makes your failure to respect their line

24   more troubling than that of other people.

25        Also, your history and characteristics include a few

1    prior criminal convictions; not terribly serious, but this

2    isn't your first brush with the law.  When you were 23 you were

3    convicted of being in a building where you weren't supposed to

4    be, recklessly endangering someone else.  And it actually

5    continued into your 30s; harassment, violating court orders,

6    issues where the disputes with your ex-wife got out of hand.

7    Blame can't all be laid at one person's feet, but there were

8    some anger issues on your side; an assault, DUI, apparently

9    arising out a bar fight.  Again, you've reached the age where

10   you need to know better.  And the important role you play in

11   guiding your daughters surely taught you to exercise better

12   judgment than you did on January 6th.

13          I'm also supposed to impose a sentence that's

14   sufficient, but not greater than necessary, to accomplish a

15   number of purposes set out in the statute.  I have to think

16   about the need for the sentence to reflect the seriousness of

17   the offense, to promote respect for the law and to provide just

18   punishment for the offense.

19          I'm also supposed to think about a sentence that

20   deters not just you, but other people from doing criminal

21   conduct in the future.  I'm supposed to protect the public from

22   further crimes that you might commit and to provide you with

23   the best environment for vocational or educational training or

24   medical care or other treatment.  And I'm supposed to think

25   about what your lawyer talked a lot about, avoid unwarranted

1    disparities, differences among sentences imposed with

2    defendants who had similar records who had been found guilty of

3    doing similar things.

4         The guidelines are supposed to help with that, but

5    they are of no utility here.  Ensuring that this sentence

6    fairly reflects where you fall on the spectrum of individuals

7    arrested in connection with this offense has largely been

8    accomplished by the offer of a misdemeanor plea, which reduced

9    your exposure substantially.

10        But I also have the benefit of the other information

11   of cases across this court arising out of January 6th.  And the

12   majority of the people who have been sentenced so far have also

13   been sentenced to misdemeanors.  But I agree with the

14   significant number of judges on this court who have insisted

15   that probation isn't the default option.  It doesn't really

16   recognize the seriousness of the offense, it doesn't fulfil the

17   legitimate statutory goals of deterrence and punishment.

18        You're a father.  You've had to teach your daughters

19   lessons.  And I think you can understand why the judges in this

20   building have been reluctant to let this searing event in our

21   history pass without real consequences.  It's why it's been

22   difficult for me to decide what to do with you.

23        I also agree with the government that this case

24   doesn't really fall within the very small category of

25   individuals who have received probation, at least from me,

1    either because of such a brief involvement in the offense or

2    unique postconviction steps that have been taken to acknowledge

3    the wrongfulness of their conduct.

4            The government recommended 45 days.  And while the

5    circumstances it laid out in detail could have supported even

6    more in my view, the -- and in the probation officer's view,

7    I'm not going to consider more than what the government is

8    asking for.

9            But at the end of the day, as Ms. Bergman mentioned,

10   every defendant who stands before me is an individual and I

11   have to fashion each sentence on an individual basis.  And so

12   I've wrestled a great deal with your case.  I was fully

13   prepared to impose a short sentence -- and I can tell you, it

14   was fully warranted -- but I do need to weigh what would be

15   gained in terms of punishment and deterrence against what would

16   be lost -- the impact on your efforts to obtain and sustain

17   employment, to serve the public, to care for others.  If we

18   weren't dealing with COVID right now, you might be a good

19   candidate for intermittent incarceration, weekends in jail.

20   But, COVID is a real risk, even with -- if I tried to sentence

21   you to a community correctional facility.

22           So I've decided that the lessons that need to be

23   taught can be taught in other ways.  But, I want to tell you

24   that if you violate any of the conditions of your probation, I

25   will not hesitate to impose a sanction.  There's not going to

1    be another conversation on this subject.

2           Therefore, in an exercise of my discretion, after

3    consideration of all the statutory factors, the sentence to be

4    imposed is as follows:

5           It's the judgment of the Court that you're hereby

6    sentenced to serve a 24-month term of probation.  I understand

7    that you're now employed and, in lieu of a period of

8    incarceration, I find it appropriate to order you to pay a fine

9    in the amount of $2,000, to be paid out on a schedule to be

10   determined by the probation office.  You are required to pay a

11   $10 special assessment.  It's immediately due and payable to

12   the Clerk of the Court for the U.S. District Court of the

13   District of Columbia.  If you change your address, within 30

14   days you have to let the clerk know where you reside until such

15   time as the financial obligation is paid in full.

16          Pursuant to your plea agreement, you're also ordered

17   to pay $500 towards the more than $1.5 million worth of damage

18   that the Capitol sustained that day.  I will waive, with

19   respect to both the fine and the restitution, any interest and

20   penalties.

21          After this hearing -- I believe this is correct --

22   that the probation officer will provide you with instructions

23   about when and where to report.  I will transfer your

24   supervision to the district in which you live, but I will

25   retain jurisdiction over this case.  I will want to be the one

1     who is informed if you have any difficulties with the law or

2     with these conditions under my supervision.

3              While under supervision shall you not possess a

4     firearm or other dangerous weapon, you shall not use or possess

5     an illegal controlled substance, and you shall not commit

6     another federal, state, or local crime.  You must also abide by

7     the conditions of supervision adopted by the U.S. probation

8     office, as well as the following special conditions:

9              First of all, you are to maintain employment.  Second

10    of all, as a condition of your probation you must abide by a

11    curfew for the first 60 days of home detention.  During the

12    daytime you may attend work, firefighting duties, your

13    daughters' activities, religious services, medical and

14    therapeutic appointments, and care for your grandmother.  But

15    you will be restricted to your residence for the first 60 days,

16    to be monitored by the form of location monitoring designed by

17    the probation office in its discretion at -- in the evening,

18    and on the weekends in the evening, on a schedule to be

19    determined by the probation office once they have obtained the

20    verification of your employment and the hours when you have

21    these activities.

22             Second of all, you must pay the $500 and the $2,000

23    fine, it will be a condition of your probation, at a rate to be

24    determined by the U.S. probation office.  You must provide that

25    office with any requested truthful financial information until

1   such time as the amount has been paid in full.  And the

2   probation office may share that information with the U.S.

3   attorney's office.

4          You must participate in any drug testing, including

5   random drug testing, to determine if you've used a prohibited

6   substance, including marijuana.  You must not attempt to

7   obstruct or tamper with the testing methods.

8          You must participate in and complete an alcohol or

9   substance abuse assessment at the direction of the U.S.

10   probation office and participate in any substance abuse

11   treatment that is indicated at the direction and under the

12   supervision of the probation office.

13          You must also participate in and complete a mental

14   health assessment at the direction of the probation office and

15   participate in any treatment that's indicated at the direction

16   of and under the supervision of the probation office, which may

17   include continuing with the treatment that you've already begun

18   with your current therapist.  You must execute any releases in

19   order to enable the probation office to monitor compliance with

20   this condition.

21          Probation office shall release the presentence

22   investigation report to any treatment agencies, and they must

23   return it upon the defendant's completion or termination of

24   treatment.

25          Mr. Rusyn, you have a right to appeal the sentence

1    imposed by this Court if the period of imprisonment was longer

2    than the statutory maximum or the sentence departed upward from

3    the guidelines -- which are not applicable in this case.  If

4    you choose to appeal, you must file any appeal within 14 days

5    after the Court enters judgment.  And if you are unable to

6    afford the cost of appeal, you may request permission from the

7    Court to file an appeal without cost to you.

8            Mr. Romano, I believe that there's a motion that

9    needs to be made with respect to dismissing some of the counts.

10           MR. ROMANO:  Yes.  Thank you, Your Honor.  The

11   government moves to dismiss the balance of the charges in this

12   case, which I believe are Counts 1, 2, and 3.

13           THE COURT:  All right.  Your motion will be granted.

14           Ms. Bergman, is there anything else I need to take up

15   on behalf of the defendant at this time?

16           MS. BERGMAN:  No, Your Honor.  Thank you.

17           THE COURT:  All right.  Mr. Rusyn, as I said, I have

18   a tremendous amount of respect for the things that you've done

19   right and the way you've lived your life in the community and

20   what you're doing for your grandmother.  And I want you to keep

21   those ideals in mind as you move forward, and hopefully we

22   won't be discussing violations of conditions in the future and

23   you will continue to be a productive citizen.

24           It looks like the probation officer -- was there

25   anything you need to say?  I was going to, I think, have the

1    two of you stay on so that you can give him instructions about

2    where and when to report.  Is he supposed to contact you after

3    this proceeding?

4              THE PROBATION OFFICER:  That works, Your Honor.  I'll

5    speak to him for a moment, after.

6              THE COURT:  Okay.  All right.  So I'm going to step

7    out then and the case will -- Court will stand down and we'll

8    close the public line and then the two of you can speak about

9    moving forward.

10             All right.  Thank you very much.

11             MR. ROMANO:  Your Honor?

12             THE COURT:  Yes?  I'm sorry, Mr. Romano?

13             THE DEFENDANT:  Thank you, Your Honor.

14             MR. ROMANO:  I'm sorry, there was one brief matter.

15   Is there an order from the Court on releasing the video

16   exhibits we submitted for sentencing?  I know sometimes those

17   are ordered to be made public following usual proceedings.

18             THE COURT:  If a motion was made to release them, I

19   would certainly grant them.  I think that would be appropriate,

20   since it was part of what was shown to me to make my decision.

21             Does anybody have any objection to that?

22             MS. BERGMAN:  No, Your Honor.

23             THE COURT:  All right, then.

24             MR. ROMANO:  And the government would certainly have

25   no objection to their release.

1             THE COURT:  All right.  Then I would publish them the

2    same way the others have been published, through the office of

3    the U.S. Attorney's office.

4             MR. ROMANO:  Thank you, Your Honor.

5             THE COURT:  Thank you, everybody.

6             THE DEFENDANT:  Thank you again, Your Honor.

7                          *   *   *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              CERTIFICATE OF OFFICIAL COURT REPORTER

2

3       I, JANICE DICKMAN, do hereby certify that the above and

4    foregoing constitutes a true and accurate transcript of my

5    stenographic notes and is a full, true and complete transcript

6    of the proceedings to the best of my ability.

7                         Dated this 25th day of January, 2022

8

9

10                        _____

11                        Janice E. Dickman, CRR, CMR, CCR
                          Official Court Reporter
12                        Room 6523
                          333 Constitution Avenue, N.W.
13                        Washington, D.C.  20001

14

15

16

17

18

19

20

21

22

23

24

25